340 So.2d 1010 (1976)
Maria J. REDDEL
v.
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS.
No. 7693.
Court of Appeal of Louisiana, Fourth Circuit.
December 14, 1976.
Rehearing Denied January 12, 1977.
*1011 Barbera & Mollere, C. F. Barbera, Metairie, for plaintiff-appellee.
Deutsch, Kerrigan & Stiles, Frederick R. Bott, New Orleans, for third-party defendants-appellees.
Jesse S. Guillot, New Orleans, William W. Irwin, Jr., D. Ross Banister, Jerry F. Davis, Johnie E. Branch, Jr., Baton Rouge, for Dept. of Highways, State of Louisiana.
Before SAMUEL, STOULIG and SCHOTT, JJ.
SCHOTT, Judge.
Defendant has appealed from a judgment in plaintiff's favor for the value of property she alleged was taken by defendant when it erected a fence on her property. Palmer and Baker Engineers, Inc., against which a judgment was rendered in favor of defendant on its third-party call, answered the appeal.
Plaintiff, in March and May, 1967, by two acts of sale acquired five adjacent lots on Utica Avenue in Jefferson Parish between Lime Street and Harvard Avenue. Contiguous to the rear or south of the lots was the right-of-way for the Interstate-10 Highway. In January, 1970, when plaintiff attempted to sell the property, she learned that a fence, constructed by defendant along the right-of-way, was approximately eight and a half feet nearer to her lots' frontage on Utica Avenue than her title called for with respect to the distance between the right-of-way line and the lots' frontage. She claims that the fence was built after she purchased her property with the result that defendant took or encroached upon 2280 square feet of her property.
Defendant denies there was an encroachment. It contends the highway and its appurtenances were constructed in the proper location, the fence was constructed before plaintiff's purchase on the original right-of-way line, and plaintiff's problem was caused by her own surveyors who erroneously located the right-of-way line and mistakenly included the disputed strip in her acquisition. Alternatively, defendant maintains that it took the disputed strip before plaintiff acquired so that she had no right of action for compensation. Further in the alternative, defendant claims that the amount awarded to plaintiff is excessive.
In 1957 a survey was made by Palmer and Baker for defendant showing the north boundary of the right-of-way to coincide with the south boundary of the disputed *1012 strip. Defendant placed in evidence its composite drawing of November 8, 1957, showing the property then required for the I-10 project in the vicinity of the property in dispute. This showed a required area of 37,053 square feet in the half square then owned by one owner and subsequently subdivided into lots, of which plaintiff eventually became the owner of five.
This exhibit demonstrates that the owner of the property in 1957 was paid for 37,053 square feet and no more. This includes only 19,579 square feet to the rear of plaintiff's property, and yet in 1970, when Palmer and Baker revised the plan of the right-of-way in order to correct the survey of 1957, a total of 21,553 square feet was shown as taken to the rear of plaintiff's property. We are compelled to conclude that the difference of about 2,000 square feet was never paid for and was not included in the expropriation proceedings against the then owner of the entire half square. While defendant intended to use it all along since the overall area and physical location of the right-of-way was never changed, notice was never given to anyone that the disputed area was used until the fence was constructed.
Apparently, defendant realized this and after the case was tried on the merits in February, 1974, defendant filed an exception of no right of action based upon the proposition that the strip had been effectively taken before plaintiff purchased the property, so that she was relegated to a cause of action against her vendors and/or her surveyors. The evidence taken in January, 1975, then focused on the question of when the fence was constructed.
In reasons for judgment the trial judge said the following:
"... At the hearing on the exceptions, the plaintiff, Maria J. Reddel, testified that shortly before she purchased the property in question she did inspect it and testified that at that time the fence which was later constructed by the Department of Highways which encroaches upon plaintiff's land, was not in existence at that time. Mrs. Reddel further testified that the highway was not completed at that time and therefore not open to traffic at that time. Furthermore, a letter was introduced on behalf of Maria J. Reddel, which was addressed to her by the State of Louisiana, Department of Highways dated February 27,1970. That letter states that there was a partial acceptance of the construction of the Interstate 10 Highway on December 15, 1967 and that the roadway was opened on that date. This letter is contrary to the allegations made in the exception filed by the State of Louisiana alleging that the construction of the highway was accepted and the highway opened for use in February of 1967. In addition, the court takes note that the Adloe Orr survey of February 21, 1967 does not show the existence of a fence encroaching upon Maria Reddel's property at that time. This Orr survey is attached to Maria J. Reddel's acquisition of the property by act before Thomas C. Wicker, Jr., Notary Public, which act and survey were filed into evidence by Mrs. Reddel."
Defendant takes issue with these findings and while there is some merit to this position we cannot say that the evidence did not provide a reasonable basis for the trial judge's specific isolated finding that the fence was not in place when plaintiff acquired the property. However, the evidence does not support his finding that the highway was not open at the time and because this becomes significant in another connection we have chosen to detail much of her testimony.
On the merits plaintiff testified on direct examination that she did not know when the fence was placed.
She testified that she first became aware of the fence being on the property in January of 1970. But on cross-examination she testified as follows:
"Q. Now, prior to [the time when you signed an agreement to purchase] did you visit the property you were going to purchase?
A. Yes.

*1013 Q. Now, that would be sometime in the early part of 1967, would it not, after January '67?
A. Yes.
Q. At the time you visited the property, was some construction work going on on the ramps or service road or the frontal road in front of that property?
A. Any property there?
Q. Was there some construction work going on either the ramps, or the frontal road near that property?
* * * * * *
A. I honestly can't remember.
Q. Did someone take you there to show you this property?
A. Yes.
Q. Did you know at that time that an 1-10 or the Expressway was passing there?
A. Well, the I-10 was there.
Q. It was there when you visited at it?
A. Yes, it was outside where the fence is.
Q. That is what I was asking: When you visited the property they were working on the I-10, weren't they?
A. It was completed.
Q. And this was in '67?
A. That's right.
Q. And specifically, January of '67?
A. Yes."
On further cross-examination by counsel for third-party defendant, the following testimony was elicited:
"Q. Now, when you first went out, before you ever bought it, when you were looking to buy it, when you were negotiating, I think you told us earlier that the I-10 was in at that time?
A. Right, yes.
Q. And did you go out the I-10 to get to your property?
A. No, I went out Veterans.
* * * * * *
Q. The I-10 was in place?
A. Yes.
Q. Do you remember what cars were on it even though you didn't go on it? * * *
Q. Yes, ma-am. When you went out there around the property, when you were negotiating to purchase, do you remember if the I-10 was in use even though you may have chosen not to use it?
A. I think it was.
Q. You knew that you were buying this property for investment purposes next to this Interstate Highway?
A. That's right.
Q. And the highway was there and the property that you though you were buying was in the area right next to the fence which parallels the highway?
A. Right, that is correct.
Q. So then you bought it after looking at it, is that correct?
A. That is right.
Q. Now, when you first see it in its condition, the property with the grass next to the fence that bordered the highway, did you buy it from
A. Gambino.
Q. And one lot from Gambino and who were the other People?
A. I think Gambino owned it or Pusch.
Q. And subsequently then, with regards to the highway and the street and the gressit is now on your land, it is now or was when you sold it in '71 in the same state as it was in January of '67 when you were negotiating to buy it?
A. Yes, sir."
From the foregoing testimony the issue would seem to be settled that when Mrs. Reddel purchased the property the completed highway was there beyond the fence and was in use. But Mrs. Reddel's clear unequivocal testimony quoted above, given on February 6, 1974, must be compared with her testimony at the trial of the exceptions in January, 1975:

*1014 "Q. Mrs. Reddel, do you recall whether or not just prior to purchasing the property in question if you went and looked at the property before buying it?
A. Yes, I drove around there.
Q. You did go there?
A. Yes.
Q. If I recall correctly, this property is along the right-of-way of the Interstate-10, is that correct?
A. Right-of-way.
Q. Do you recall how you got to the property, that is, from what highway or street did you come from?
A. From Veterans into the service road."
For some inexplicable reason, defendant has maintained in this Court that there was a service road on plaintiff's side of the fence but this is clearly contradicted by the evidence. The surveys indicate that a service road ran up to the north side of Utica and then came to an end. There was no service road continuing on the other side of Utica Avenue behind plaintiff's property. Instead the fence on the east side of the service road continued across Utica Avenue and then continued to form the boundary of plaintiff's lots and the Highway Department right-of-way, so that traffic would exit the service road from the north and be forced to take a right turn to the west along the front of plaintiff's property on Utica Avenue. Mrs. Reddel's testimony continued:
"Q. As you drove along Utica to the property in question, did you see any fences along the right-of-way of the Interstate Highway?
A. No.
Q. Did you see any fence along the property that you ultimately purchased?
A. No."
On cross-examination the following questions were put to Mrs. Reddel:
"Q. Have you been on the service road, Mrs. Reddel, after or since you have purchased this property. Have you been back on the service road?
A. Well, yes.
Q. There is a fence there now between the service road and the Interstate, is there not?
A. Yes.
Q. The service road was completed at the time you drove to the lot when you purchased it?
A. Yes."
From the foregoing testimony it can be readily seen that confusion set in on the location of the service road as having something to do with the property now in dispute. But as stated above, it is clear that the service road stopped on the north side of Utica Avenue and was never intended to run behind plaintiff's property.
The letter from the Highway Department that was placed in evidence at the trial of the exception apparently convinced the trial judge of plaintiff's case. It was written on February 27, 1970, to Mrs. Reddel and it reads in pertinent part as follows:
"We wish to advise that the right-of-way concrete markers were placed on the State project No. 740-00-53. Partial acceptance of this project was made September 30, 1966, and final acceptance was on March 14, 1967. The chain link fence was constructed under State project No. 740-00-35. Partial acceptance on this project was made December 15, 1967, and the roadway was opened to traffic on that date. Final acceptance was made March 5, 1968.
"To determine the exact date on which the right-of-way concrete markers were placed, and the fences constructed, will require research of the project files and project diaries, which are in our Baton Rouge headquarters."
It is significant that this letter by defendant to Mrs. Reddel, dated February of 1970, specifically advises that the exact date when the fences were constructed in connection with the project was not known to the writer but was available at defendant's headquarters, so that the question of the *1015 date of installation is not answered by this letter. The letter does state that the highway was opened to traffic in December of 1967, contradicting Mrs. Reddel's earlier testimony that when she inspected the property before her purchase the highway was in use.
In any event, defendant produced at the trial of the merits the testimony of James R. Wheat, a supervisor of surveyors for the Highway Department. The following testimony was elicited:
"Q. Do the records of the Department of Highway indicate when the properties were acquired within the right-of-way line for construction purposes?
A. When the property was acquired?
Q. Yes.
A. I believe they were acquired by expropriation in 1959.
Q. And would the records indicate when the construction started and ended?
A. It indicates that the construction was completed or the project had been completed, inspected, and accepted prior to or on February 27, 1967.
Q. In other words, as of February 27, 1967, the fence and the complete right-of-way project was finished?
A. Right.
Q. The fence was installed and everything?
A. That was the date that the Department accepted it, so after all this had been built, it had to be there prior to that, but probably not any more than seven months or so."
When her testimony is scrutinized, plaintiff cannot be said to have admitted that the fence was in place when she bought the property. It is fair to say that she could not remember one way or the other. But in its letter, defendant admitted that the chain link construction project was not accepted until December, 1967, some seven to nine months after plaintiff acquired. This sharply contradicted the testimony of Wheat who said that the project was accepted before February, 1967, and this was the only positive testimony offered by defendant on the point.
Perhaps the trial judge gave little weight to Wheat's testimony because he did not purport to have first-hand knowledge of these events and was testifying only from defendant's records. Perhaps the trial judge considered Wheat's testimony discredited by the letter. In any event, he was entitled to infer that the fence was not there when plaintiff acquired.
On the other hand, the record does disclose that the highway was in use when plaintiff acquired based upon her own admission. This provokes us to inquire whether the disputed property had been taken when plaintiff acquired even though the fence was not yet built.
We are not favored with any evidence of the exact configuration of the parts of the right-of-way such as the roadways themselves, a neutral strip if any, the shoulders, the green area along the roadways and the fences themselves, but it seems certain that there is a grassy or planted area between the fence and the roadway at least eight and one-half feet wide. The question of when this strip was taken is not answered by determining when the roadways were opened because none of the construction necessarily took place in the grassy area adjacent to plaintiff's property.
When plaintiff acquired she knew only that her property extended to the right-of-way line. At that time defendant's very survey showed this line to be outside of the disputed strip. No fence was there and no possession had been taken by defendant of the narrow grassy strip between plaintiff's lots and defendant's right-of-way. The only physical indication that this strip was within the right-of-way was the presence of the concrete monumental markers apparently placed there in 1966 but well hidden by the grass when plaintiff purchased. We have concluded that defendant did not effectively take this property until sometime after plaintiff acquired and she is entitled to compensation.
*1016 As an alternative, defendant contends that the compensation of $9,758.40 awarded to plaintiff is excessive. The trial court arrived at this amount based upon the market value of $4.28 per square foot as of October, 1972. The parties stipulated at to various market values on different dates, and the trial judge chose to use the date when judgment was rendered overruling some exceptions filed by the defendant in the initial stages of this litigation.
Other alternatives were the values as of the time the property was bought in January, 1967, when the fence was erected in December, 1967, when plaintiff first became aware that the fence was constructed on her property in January, 1970, and when plaintiff filed her suit in May, 1972.
At the outset we find no authority to support the amount as of the time the initial exceptions were overruled as used by the trial court. A review of the prevailing jurisprudence seems to support either the date of the taking, the date when plaintiff acquired knowledge, or the date when defendant's answer was filed.
In Cruell v. Jefferson Parish, 216 So.2d 604 (La.App.4th Cir. 1968), writs refused, 253 La. 640, 219 So.2d 175, defendant took plaintiff's property in 1954 but plaintiff did not discover this fact until 1958. She filed suit in 1962 demanding compensation to be fixed at the market value as of 1958 when she learned that the property was taken. The Court found that she was entitled to compensation based on the date she acquired knowledge of the taking and rejected the contention that she was relegated to the value as of the time of the actual taking. That case would seem to dictate that plaintiff was entitled to compensation at least based on market value as of January, 1970, when she discovered that the fence was on her property.
However, the problem is complicated by Koerber v. City of New Orleans, 228 La. 903, 84 So.2d 454 (1955), in which the City took possession of plaintiff's property for construction of an airport in 1941. Plaintiff discovered the taking in 1946, and yet compensation was awarded as of the date defendant filed its answer to plaintiff's suit in 1951. If this case controls it would appear that plaintiff's damages would be based on the market value as of February, 1973, and the trial court's judgment should be affirmed. Aside from the fact that this resolution of the problem would be inconsistent with the Cruell case, our decision must be influenced by A. K. Roy, Inc. v. Board of Com'rs for Pontchartrain L.D., 238 La. 926, 117 So.2d 60, in which plaintiff's property was taken and he acquired knowledge at the time of the taking but took no action until several years later. In refusing to apply the rule of the Koerber case, the Court held as follows:
"Under the particular facts of this case, the rule of the Koerber case is not controlling, and we think applicable instead the jurisprudence holding in effect that where a property owner, with full knowledge that its property has been taken possession of by a public body for the purpose of constructing public works, stands by without resistance or complaint, as was the case here, considerations of public policy require that the owner shall not be permitted to reclaim its property but shall be restricted to a claim for compensation for the value of the property taken and for damages to adjacent land, if any, determined as of the date of the taking."
Further distinguishing the Koerber case in a footnote the Court observed that while Mrs. Koerber's property was taken in 1941 and she acquired knowledge of this taking in 1946, even though she did not file suit until 1949, she had engaged in conversations and correspondence with respect to the property and seemingly explained why her suit was not filed when she first acquired knowledge of the taking.
Thus, it seems that the instant case is unlike both the Roy case and the Koerber case. It differs from the former in that she did not acquire full knowledge of the taking from the very time it was taken and then do nothing for a number of years, and her case differs from the latter in that she did not offer an explanation as to why no action *1017 was taken from the time she acquired knowledge in January, 1970, until she filed suit in May, 1972. Thus, we have concluded that plaintiff is entitled to compensation based on market value of $2.30 per square foot in January, 1970, or the sum of $5,244.00. She is entitled to interest from the date that the property was taken in December, 1967, pursuant to the Roy case.
Palmer and Baker, Inc. and defendant have stipulated through their counsel that they, in the trial court, agreed to a settlement of the third-party demand regardless of the outcome of the main demand. Pursuant thereto they have stipulated that the third-party demand should not have been granted in the trial court and should now be dismissed.
Accordingly, the judgment in favor of plaintiff and against defendant is affirmed but is amended so that the judgment is for $5,244.00 with legal interest from December 1, 1967, until paid. The judgment in favor of defendant on its third-party demand is annulled and set aside. In all other respects the judgment is affirmed.
AFFIRMED IN PART, AMENDED IN PART AND ANNULLED IN PART.