504 So.2d 664 (1987)
Archie THIGPEN, et ux, Plaintiffs-Appellees,
v.
Jules MOSS, et ux, Defendants-Appellants.
No. 86-289.
Court of Appeal of Louisiana, Third Circuit.
March 24, 1987.
Gus Voltz, Jr. of Voltz and Ware, Alexandria, for defendants-appellants.
Michael M. Wahlder, Alexandria, for plaintiffs-appellees.
Before GUIDRY, STOKER and LABORDE, JJ.
*665 STOKER, Judge.
This appeal arises out of a suit for injunctive relief filed by the plaintiffs, Archie and Lillie Thigpen. The controversy involves the right of the owner of the dominant estate (Thigpen) to discharge sewerage effluent onto the servient estate of the defendants, the Mosses. The defendants, Jewel Moss and Verla Looper Moss, have appealed the judgment of the trial court. That judgment enjoined (1) defendants from making any work on their property which would impede the natural flow of surface water from the plaintiffs' property and (2) further enjoined the plaintiffs from discharging sewerage effluent from their oxidation pond until it is chlorinated with a sufficient amount of chlorine to render it safe for human uses, except drinking. We amend the judgment in part and affirm as amended.

FACTS
The plaintiffs are the owners of a tract of land situated in the Northeast Quarter of the Southeast Quarter of Section 8, Township 6 North, Range 1 West (NE1/4 of SE1/4 of Sec. 8, T6N, R1W) in Grant Parish. The defendants own property adjacent to the plaintiffs on the south. For two or three years prior to the institution of this suit, the plaintiffs developed their property for the purpose of opening and operating a mobile home park. The property was cleared, leveled and ditched to improve its drainage, and a road was put in. The plaintiffs designed and built an oxidation pond to service the needs of the mobile home park. The oxidation pond was built approximately five to six feet from the plaintiffs' and the defendants' common boundary. (Although the record in this case contains no direct evidence or indication of a boundary question being involved, it is alleged in defendants' brief that a boundary dispute concerning the properties in question is currently pending in another suit.) Additionally, this pond was designed to discharge through a flow pipe into ditches dug alongside the pond, which in turn flow directly onto the northern part of the defendants' property. The elevations of the two properties are such that the drain of surface water is from north to south.
Sometime in August of 1984 the defendants decided to place an embankment or levee across a depression at the boundary of the two properties in order to construct a fence to contain their livestock. A levee was constructed exactly at the point where the plaintiffs' ditches drained onto the defendants' land. Shortly thereafter a heavy rain fell which caused the water draining from the plaintiffs' property to stand in their ditches. This in and of itself posed no problem except for the fact that the oxidation flow pipe was in danger of becoming covered by the water standing in the ditches. Had the water covered the flow pipe, the pond would not have been able to empty its contents, thereby flooding the sewer lines servicing the mobile homes. At the time, only two mobile homeowners had rented space and were utilizing the sewerage system. The plaintiffs promptly capped the flow pipe and installed individual septic tanks to service the two mobile homes. This suit for injunctive relief quickly followed. The defendants answered the suit and reconvened against the plaintiffs, seeking to enjoin their operation of the oxidation pond and its inevitable discharge onto their property.
The defendants have designated two assignments of error in this appeal. They are as follows:
1) That the trial court erred in permitting the plaintiffs to discharge chlorinated effluent onto their property; and,
2) That the trial court erred in prohibiting them from building any work which would impede the flow of waters from the Thigpen property.
The issues presented in this case, as we perceive them, are (1) whether the discharge of effluent from this oxidation system is part of the natural flow of surface water entitled to the servitude of drainage upon the servient estate, (2) whether the plaintiffs have channeled or localized the flow of surface water to an area which would not be their natural destination so as to violate defendants' rights and (3) whether *666 defendants may fill in the depression on their property even if it should result in blocking or preventing the flow of natural drainage from plaintiffs' land across defendants' land.

DOES A SERVITUDE OF NATURAL DRAIN PERMIT THE DISCHARGE OF CHLORINATED EFFLUENT
The defendants argue that they should not be compelled to accept the discharge of effluent upon their property, whether chlorinated or not. There is no question that the defendants' property is servient to the plaintiffs' property. The natural flow of surface waters is from north to south across the plaintiffs' and defendants' properties and eventually into the Gray's Creek drainage system. Plaintiffs' property at its northern boundary is approximately ten feet higher than at its southern boundary. No one disputes that the surface waters drain to the south.
The articles of the Louisiana Civil Code governing a situation such as the one presented here are the following:
"Art. 655. Natural drainage
An estate situated below is bound to receive the surface waters that flow naturally from an estate situated above unless an act of man has created the flow."
"Art. 656. Obligations of the owners
The owner of the servient estate may not do anything to prevent the flow of the water. The owner of the dominant estate may not do anything to render the servitude more burdensome."
"Art. 667. Limitations on use of property
Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
"Art. 668. Inconvenience to neighbor
Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
"Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage."
The plaintiffs did not seek or obtain the permission of their neighbors to the south to discharge effluent onto their property, nor did they seek or obtain appropriate easements or rights of way. The plaintiffs argue that because the natural flow of surface waters is in a southerly direction and because they have channeled all of the flow from their property into an area of natural drain, the defendants are bound under LSA-C.C. art. 655 to receive it.
The owner of the dominant estate may cut ditches and canals which concentrate and speed the natural flow of surface waters. However, plaintiffs, as owners of the dominant estate, are not entitled to concentrate the flow of surface waters so as to flow on the lower lands of defendants at a point which would not be their natural destination and thereby increase the volume of water which would by natural flow run over defendants' servient estate and thus render the servitude due by the servient estate more burdensome. Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314 (La.1981); Parish of East Baton Rouge v. Pourciau, 387 So.2d 645 (La.App. 1st Cir.1980); David v. Dixie Rice Agricultural Corp., 379 So.2d 62 (La.App. 3d Cir.1980), writ refused, 382 So.2d 166 (La.1980), and Bentley v. Industrial Fire Protection Co., 338 So.2d 1177 (La.App. 2d Cir.1976).
Thigpen testified that he leveled his land, dug ditches going from north to south and added culverts in spots to facilitate the drainage of his property. It is apparent that plaintiffs did not want water to stand or pool on their property in order to avoid causing inconvenience to tenants. All of these north-south ditches enter two lateral ditches dug parallel to the southern boundary. *667 The lateral ditches run in an east to west direction, and one empties on the west side and one empties on the east side of a depression consisting of an old "shiner pond" located at the northern part of the defendants' property. As a result, the flow from plaintiffs' property is concentrated at the shiner pond depression. The trial court in its reasons for judgment found that the plaintiffs' works had increased the rate at which the surface waters flowed, but found no increase in the volume of water flowing as a result of the ditches. Accordingly, the trial court only addressed the problem of the discharge of effluent as a burden on the servient estate. We find no manifest error in the trial court's finding that there was no increase in the volume of flow of surface water caused by plaintiffs' system of ditches, but we do find that the holding concerning discharge of effluent was clearly wrong.
The offending oxidation pond system is situated directly north of and adjacent to the "shiner pond." The oxidation pond system is composed of three ponds or cells which contain and treat the effluent. The sides of these ponds are built up by several feet, and the only way for them to drain is by the installation of a flow pipe at the maximum water level of approximately four and one-half feet within the pond. If the ponds become filled due to rainfall, they will discharge. If they become filled from the discharge of waste water from the trailer park, they will discharge. Any water which accumulates over four and one-half feet will be discharged.
The plaintiffs contend that, because of the effects of evaporation and percolation, the ponds will not discharge. Yet the experts testified that oxidation ponds in Louisiana do not work as they should because Louisiana's average annual rainfall exceeds the rate of evaporation. Therefore, anytime that rain causes the contents of the ponds to exceed the maximum level, they will discharge. Such excess rainwater will mix with the effluent and as a result cause effluent to discharge onto the defendants' property. These systems involve by their very nature and design a forced drainage of the effluent by way of the flow pipe. As Mr. Thigpen testified, the standing rainwater being contained by the defendants' levee would not create a problem, except in the event that the levee caused water to rise above the level of the flow pipe. In such cases, drainage of the oxidation pond would cease.
In the case of Nicholson v. Holloway Planting Company, 216 So.2d 562 (La. App. 1st Cir.1968), affirmed, 255 La. 1, 229 So.2d 679 (1969), the court found that water in basin areas of the dominant estate, which could only be drained with the aid of artificial facilities, were not part of the natural flow of surface waters which the servient estate was bound to receive. The basins and crevasses which drained the property were a result of natural forces upon the land, yet they were not found to flow naturally. The sewerage system in question here is a man-made excavation with retaining walls which drain by artificial means.
The trial court in the case before us concluded in its reasons for judgment that the drain in question was in fact a natural drain and, accordingly, the plaintiffs enjoyed the natural servitude provided by LSA-C.C. art. 655. The trial court further concluded, however, that the discharge of effluent "may constitute a burden to the servient estate." Nevertheless, the trial court concluded that the "burden" could be ameliorated by chlorination. We agree with the trial court that the natural drain of surface waters is over the defendants' property, but we disagree that the forced drainage of effluent from man-made ponds is encompassed in the natural servitude of drain. In our opinion even chlorinated effluent would constitute a burden on the servient estate in contravention of LSA-C.C. art. 656.
The trial court in its reasons for judgment made the following comment:
"It was the opinion of all the experts who testified that the effluent which would ultimately reach the defendant's [sic] property would contain some potentially harmful bacteria and suspended solids. The precise amount of these solids *668 and bacteria could not be determined, but it was estimated that the effluent would have a B.O.D., biological oxygen demand, of approximately 35 parts per million. It was determined that water with B.O.D. of this level would be unsafe for human consumption and possibly unsafe for animal consumption. It was also speculated that if it were allowed to stagnate, this water could become noxious smelling.
"In view of this evidence, the Court concludes that effluent from the present sewage treatment system may constitute a burden to the servient estate. However, it has been determined that with the use of a chlorinator the effluent could be made safer, cleaner and less of a problem.
"For the above reasons, the Court holds that the plaintiffs are enjoined from discharging effluent from the oxidations [sic] ponds unless and until that effluent is chlorinated with a sufficient amount of chlorine to render it safe for human uses, except drinking. And having determined that a servitude of natural drainage exists, it is further the holding of the Court that the defendants be enjoined from building any work which would impede the natural flow of surface waters from the plaintiff's [sic] land."
The trial court erroneously concluded that defendants can be required to accept chlorinated effluent. Defendants are required to accept only the natural flow of surface waters. In this connection see A.N. Yiannopoulos, Predial Servitudes, Sec. 18 in 4 Civil Law Treatise 58-62 (1983).
In further support of their case, plaintiffs urge that they were within their rights to discharge effluent on defendants' property because they had obtained approval from the Louisiana State Department of Environmental Quality (DEQ) for the design and specifications of the proposed sewerage system. Compliance with the state laws and regulations concerning health standards do not alter the rights set forth in the Civil Code. Moreover, the permit and authorization issued to plaintiffs by DEQ contained caveats to that very effect.
In oral argument counsel for plaintiffs urged that the demands for housing would justify our relaxing the force of the Civil Code articles so as to encourage the development of property for residential use. We were urged to take such a step under the guise of interpretation. However, the articles of the code do not admit of any such interpretation. Any exceptions to be permitted should be addressed to the legislature.

MAY DEFENDANTS RESTORE THE SHINER POND TO ITS ORIGINAL LEVEL?
The defendants complain that the judgment of the trial court prevents them from restoring the original elevation of their property at the location of the depression or "shiner pond." There is, however, some dispute concerning this area of natural drain. Defendants admit that the area is presently a low spot on their property, but contend that it is a man-made depression created in about 1946 by Mrs. Moss' father, Mr. Looper. The testimony from neighboring property owners corroborates this. Mr. Looper constructed two ponds on the property, one for fish, and one in which to raise shiners. The plaintiffs contend that the depression consisting of the shiner pond is simply the natural drain.
The testimony of the witnesses, including that of Mrs. Vera Mae Bostwick (sister of Mrs. Moss and daughter of Mr. Looper) establishes that the fish pond was constructed on the south part of the Looper property. In fact, the area once covered by the fish pond extended over Mrs. Bostwick's land which borders on the Moss property on the south. This fish pond location plays no part in the controversy in this case. The area involved in the dispute is located where the old shiner pond was located. The pond evidently fell in disuse at sometime and became a bog. Several witnesses testified that the shiner pond extended well north of the east-west fence erected by Thigpen along what Thigpen considers to be the boundary between the *669 Thigpen property and the Moss property. They also testified that an old fence running east and west once existed north of the Thigpens' present fence and was considered at that time to be the boundary.
While the record contains no direct evidence of a boundary dispute, the brief of the Mosses contains the allegation that a suit was pending involving the ownership of a thirty-five foot strip along the northernmost portion of the Moss property. The testimony indicates that cause for dispute may exist, but such a dispute is not relevant for our purposes. What is relevant is that the man-made depression consisting of the shiner pond once extended over property north of what the Thigpens now claim to be the Moss-Thigpen boundary as well as south of it.
Two expert witnesses, civil engineers, testified in this case. Mr. Clayton Webb testified on behalf of the Thigpens, and Mr. Frank Willis testified on behalf of the Mosses. Both examined the area of the Thigpen and Moss properties and ran levels of various points in the topography. Their testimony is consistent with what is virtually undisputed, namely, that generally the Thigpen land is higher than the Moss land, and the natural flow of water is south and runs from the Thigpen property across some portion of the Moss property.
Mr. Webb used a control point or datum of 92.6 feet taken from an iron pen on an oak tree inside the oxidation pond. In relation to this elevation, Mr. Webb found other elevations as follows:

Top of the Moss levee 92.3'
Natural drain at the Moss-Thigpen
 property line 88.15'
Level at bottom of east-west lateral ditch
 dug by Thigpens 90.7'
Natural ground level around the
 Thigpens' oxidation pond 32.65'
Ground level at the bottom of the
 excavated oxidation pond 90.6'

Mr. Webb testified that a drop of 1.7 feet in the height of the Moss levee would create a fall of 3/10 of a foot from the bottom of the Thigpen ditch. A lowering of the levee as suggested would put the top of the levee at 90.6 feet (92.3' less 1.7' = 90.6'). Mr. Webb testified that the bottom of the east-west Thigpen lateral ditch was 90.7 feet; therefore, it would seem to us that a lowering of 1.9 feet would be required to attain a 3/10-foot fall (92.3' less 1.9' = 90.4', and 90.7' less 90.4' = .3'). However, the difference of 2/10 of a foot is not especially significant.
The finding of Mr. Webb that the level at the Thigpen-Moss property line was 88.15 feet is evidently a level confined to the shiner pond area. This is consistent with the fact that the lateral ditch did not cross the shiner pond area but stopped at the east and west sides of it.
Mr. Willis, the Mosses' expert, took his datum from the center line of the highway on which the properties front. That datum was 93.3 feet and, based on that datum, Mr. Willis found the following elevations:

Top of the Moss levee 96.6'
Center line of east-west lateral ditch dug
 by Thigpens 93.3'
Ground level at Moss-Thigpen property
 line 98'

These elevations would indicate that the Moss levee was 1.4 feet lower than the level at the property line. However, a plat of survey prepared by Mr. Willis shows this is not the situation in the area of the shiner pond. The plat (D-7) shows elevations all along the Moss-Thigpen property line to range generally at 98 feet, but at the edges of the shiner pond area the elevation drops to 97.17 feet and 97.5 feet. More significantly, however, Mr. Willis shows a break in the Moss levee bottom to 93.3 feet. The elevation is the same as the elevation which Mr. Willis found for the east-west lateral ditch made by the Thigpens.
The conclusion we reach from Mr. Willis' testimony, as illuminated by his plat, is that the elevation of the shiner pond area before the Thigpens and the Mosses commenced their respective ground changes was something in the range of 93.3 feet. Therefore, the top of the Moss levee (96.6') was three and three-tenths feet (3.3') higher than the level of the shiner pond area.
*670 Photographs in evidence, such as P-3 and P-4, show that the Moss levee causes approximately two feet of water to stand inside the fence on the alleged Moss-Thigpen property line.
From the evidence and testimony reviewed above, it appears that the Moss levee prior to the washout would block drainage in the shiner pond area and impound water to a depth of two feet or more. The Mosses have urged before us that they merely wish to restore the shiner pond area to its original level, that is, to the original ground level which existed prior to the time that Mr. Looper (father of Mrs. Moss) excavated and created the shiner pond depression. We experience difficulty in accepting this contention. To begin with, the evidence does not show the level of the shiner pond before its creation. Mr. Larry Barton did the dirt work to make the Moss levee. He testified that the purpose of the levee was to permit the Mosses to erect a fence at an even level all across the property. To do this he tied into the east and west shoulders of the shiner pond. These facts do not indicate what the elevation of the ground was before the shiner pond was made.
A further consideration we must take into account is the fact that Mr. Looper built the shiner pond to extend north well beyond what the Thigpens consider to be the property line. At sometime later the shiner pond was apparently abandoned and was allowed to become a bog. We may conclude that the man-made depression created by the making of the shiner pond and its subsequent history made a depression which became an artificial drainage course if a natural drainage course did not exist previously. All indications are that some natural drainage course did exist where the shiner pond was built.
For us to conclude now, after some forty years, that the Mosses may fill in the shiner pond area on their side of the Thigpen fence, might well be mere dicta. If the Thigpen fence is on the correct boundary line, the depressed area on the Thigpen side of the line would be flooded by waters impounded by the Moss levee after heavy rains. If some resolution of a property boundary action were to place the property line north of the depressed area in question, the right to fill in the depressed area might arise. However, in the suit before us in this appeal, the property line is not at issue. This case must be resolved on the assumption that the Thigpen fence is on the property line.
The trial court's reasons for judgment did not set forth any findings of fact concerning the injunction sought by the Thigpens. The trial court simply stated that the injunction should be granted because a servitude of natural drain existed and the formal judgment enjoined the defendants (the Mosses) "from building any work or dam or other type impediment which would impede the natural flow of surface water flowing from plaintiffs' property and oxidation ponds onto the property of the defendants."
We have considered the appropriateness of remanding the case to the trial court for a determination of the original elevation of the shiner pond area. We doubt that such a course would be productive and might well be impossible. Moreover, we conclude that the levee was admittedly raised to the general 97 to 98-foot level (as set according to Willis' datum) on the Moss land. Presumptively, therefore, the top of the Moss levee would be higher than the original natural elevation where the levee was built. Also, we consider that raising the levee impounds water north of the Thigpen fence in a depression made by Mrs. Moss' father. This seems to us to raise equitable considerations at least. Finally, we consider that the depth of the area in which water is impounded between two and three feet.
We conclude that the impracticability of determining the original level of the shiner pond some forty years ago, together with the other factors discussed, require that we deem the present level of the shiner pond depression to be, for all practical purposes, the natural drainage course. We specifically do not rest our decision on any considerations of prescription or other principles established by the civil code because we *671 find none applicable to the unique facts of this case other than Article 21 of the Civil Code. We have considered certain cases in the jurisprudence which, while instructive, do not fit the precise facts of this case. See, for example, Walters v. Thrasher, 381 So.2d 557 (La.App. 2d Cir.1980); Lafleur v. Topp, 352 So.2d 426 (La.App. 3d Cir.1977); Wappler v. Braucht, 209 So.2d 603 (La. App. 2d Cir.1968), writ refused, 252 La. 173, 210 So.2d 55 (1968), and State ex rel. Wood v. Pinder, 41 So.2d 479 (La.App. 1st Cir.1949).
Under equitable principles, we conclude that no great hardship will be borne by the Mosses as a result of the injunction which directs them not to block or prevent drainage from the Thigpen property. As indicated at trial, and as reiterated in defendants' brief, defendants contend that their purpose in erecting the levee was not to prevent the flow of surface water. The purpose of the Moss levee was not to fill in or level all of the depression on the Moss property; rather, it was to permit the construction of a fence all across to the north side of their property. The photographs in evidence show that a levee was built. It would appear that the water which collects in plaintiffs' ditches could be provided an outlet through the levee easily enough through the means of installation of culverts, one or more spillways or other gaps through the levee. We think that such measures would not compromise the functioning of defendant's fence as an enclosure. See Wappler v. Braucht, supra.

CONCLUSION
For the foregoing reasons, we conclude that the injunction granted by the trial court enjoining the blocking of drainage of surface waters from the plaintiffs' property onto defendants' property was not error, and we affirm that portion of the judgment with slight amendment to eliminate the flow of effluent from the oxidation pond. If some adjustment of the property line to place it north of the Thigpen fence line shall have taken place, or should take place in the future, the ruling in question could conceivably be made moot or inapropros. With this caveat or reservation, we affirm the granting of the injunction in favor of plaintiffs.
We further conclude that the plaintiffs should be enjoined from discharging effluent, whether chlorinated or not, from the sewerage oxidation system unless they acquire a conventional servitude of drainage from the defendants to discharge onto their property. Otherwise, plaintiffs must find an alternative route to discharge the effluent into the Gray's Creek drainage system.
For the reasons stated above, the judgment of the trial court is hereby amended to enjoin plaintiffs, Archie Thigpen and Lillie Thigpen, from discharging any effluent from their sewerage oxidation system onto the defendants' property. The judgment is further amended to enjoin defendants, Jules (Jewel) Moss and Verla Looper Moss, from building any work, levee, dam or other device on their property which may prevent or obstruct the natural flow of surface waters flowing from plaintiffs' property onto the property of defendants. In all other respects the judgment of the trial court is affirmed.
The costs of this appeal are assessed equally between the parties.
AMENDED IN PART; AFFIRMED AS AMENDED.