599 So.2d 378 (1992)
Calvin MATHIS, Plaintiff-Appellee & Appellant,
v.
CITY OF DeRIDDER, Defendant-Defendant-Appellant & Appellee.
No. 90-1240.
Court of Appeal of Louisiana, Third Circuit.
April 16, 1992.
*380 Charles A. Jones III, DeRidder, and Maughan, Atkinson & Martin, Roy H. Maughan, Jr., Baton Rouge, for plaintiff-appellee & appellant.
Lundy & Dwight, Winfield Little, Lake Charles, for defendant-defendant-appellant & appellee.
Before STOKER and YELVERTON, JJ., and WILLIAM A. CULPEPPER[*], J. Pro Tem.
STOKER, Judge.
This is an appeal by the plaintiffs, Calvin and Violet Mathis, and the defendant, the City of DeRidder, from a judgment in favor of the Mathises in an inverse condemnation suit. The Mathises filed this suit against DeRidder for an injunction and for damages caused by DeRidder's taking of a servitude of drain for treated sewerage effluent. The effluent is discharged into Barnes Creek, which traverses the Mathises' property. Although DeRidder had obtained the proper permits to discharge the *381 effluent into Barnes Creek, it neglected to obtain drainage servitudes from the contiguous landowners, pursuant to LSA-R.S. 19:101, et seq, and R.S. 33:4162. The trial judge denied the injunction at a hearing prior to trial and that issue is not before us in this appeal. At trial, the trial judge held in favor of the Mathises, awarding compensation for the servitude taken, severance damages, interest from the time of the taking, attorney fees, expert witness fees and costs.
DeRidder contends on appeal that the evidence does not support an award of severance damages. Alternatively, DeRidder contends that if an award is called for, there is no evidence in the record on which the amount of the award may be based.
The Mathises contend on appeal that the trial judge erred in failing to award the costs of fencing the entire servitude and of bridging the servitude, in awarding insufficient compensation for the servitude, in failing to award damages for inconvenience and annoyance under LSA-C.C. arts. 667-669, in awarding inadequate severance damages and in awarding insufficient expert witness fees and attorney fees.
We affirm.

OPINION
The trial judge in this case wrote extensive, thorough, excellent written reasons for judgment, which we adopt herein as our own and attach hereto as Exhibit A. For the most part, we refer the parties to these reasons for judgment in answer to their assignments of error, since the assignments are factual in nature. Under the standards of appellate review set forth in Rosell v. ESCO, 549 So.2d 840 (La.1989), and Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990), we find no manifest error in the trial judge's findings of fact or in his evaluations and reconciliations of the expert testimony. The damages, costs and fees awarded were based upon sound legal principles and the evidence presented at trial. The trial judge did not clearly abuse his much discretion in awarding damages.

1.
Regarding DeRidder's assignments of error, the trial judge's written reasons fully support his conclusion that the flow of effluent through plaintiffs' land caused a diminution of value of the land outside of the servitude. Aside from esthetic considerations, the trial judge based his holding on the conclusion that the remainder of plaintiffs' property would be less attractive to prospective buyers. DeRidder alternatively contends that the cost to cure method of valuation was inappropriate for determining any diminution of value of the property outside of the servitude. In adopting the cost to cure approach, the trial judge took the cost of fencing the servitude as the cost to cure. The trial judge observed that "[w]ithout the fence it is probable that the value of the land outside the servitude area would be reduced by an amount at least equal to the cost of fencing the right-of-way."
We will add that there was testimony that cattle had to be kept away from the bogs and mud created by the continuously flowing streams.
For these reasons we find no merit to DeRidder's contentions that severance damages were not proven because the effluent was not shown to be harmful in fact, and, in any event, that the cost to cure approach (using the cost of fencing) was not justified.

2.
As to the Mathises' assignments of error, we refer them to applicable statutes as well as the reasons for judgment. Under LSA-C.C.P. art. 1920, the trial judge has broad discretion in awarding expert witness fees. Under LSA-C.E. art. 702 and Official Comment (d), the trial judge has broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert. We do not find that the trial judge abused his discretion in awarding the expert witness fee for Dr. Garcia or in not accepting James Bruce's testimony as that of an expert in geology and hydrogeology.
*382 Finally, under LSA-R.S. 13:5111, the trial judge was required to compensate plaintiffs for reasonable attorney fees actually incurred. The trial judge awarded $6,139.59 for attorney fees, which is 25% of the award for the taking and severance damages. Plaintiffs have stated that they have a contingency fee contract with their attorney for 25%. Since this is a reasonable fee and is the expense actually incurred, we find no abuse of the trial court's discretion. Moreover, although DeRidder appealed the judgment, so too did the Mathises. The Mathises raised many more issues on appeal than did DeRidder. Since the Mathises have lost their appeal, we see no reason to award additional attorney fees.

CONCLUSION
For the reasons given, the judgment of the trial court is affirmed. Costs of this appeal are assessed one-half to Calvin and Violet Mathis and one-half to the City of DeRidder.
AFFIRMED.

EXHIBIT A

NO. C-87-866

Calvin Mathis, et ux

Versus

City of DeRidder

36th Judicial District Court

State of Louisiana

Parish of Beauregard

WRITTEN REASONS FOR JUDGMENT
Since December, 1986 the City of DeRidder (City) has been operating a sewage treatment facility on Ball Road and discharging the effluent into an existing natural drain known as Barnes Creek. The natural drainage in the area is to the south from Ball Road and the effluent from the oxidation ponds drains through the creek in that direction. Plaintiffs Mr. and Mrs. Calvin Mathis own approximately 240 acres of land located three to four miles south of Ball Road and Barnes Creek traverses that property in a general north-south direction.
Before the City began discharging the effluent, Barnes Creek lacked a sustained flow of water throughout the year and was considered an intermittent stream. During the wet rainy season, particularly in the winter months, it generally had water flowing in it, and during the hot dry season, particularly in the summer, it was usually dry in most locations. Once the discharge of effluent began there has been a constant flow in the stream throughout the year due to approximately two million gallons being released daily.
The City obtained proper permits from federal and state agencies to operate the Ball Road sewage facility and to discharge the effluent into Barnes Creek. However, it neglected to obtain drainage servitudes from plaintiffs and the other landowners through whose properties the effluent was to flow. Because of the nature and quantity of the effluent this was a mistake and the City now concedes as much. Governmental permission to discharge the effluent into the creek did not give the City the right to drain it over private property without the consent of the owners. See Thigpen v. Moss, 504 So.2d 664, 668 (La.App. 3 Cir.1987).
The law recognizes that there is a natural servitude of drain for surface waters that flow naturally from the dominant or higher estate onto the servient or lower estate. However, there is no servitude if the flow is created by act of man. The flow of refuse waters (sewage, industrial wastes and the like) is considered to be the result of an act of man and, accordingly, there is no servitude for such waters. Thigpen v. Moss, supra. Further, the owner of the dominant estate may not do anything on the property which increases the volume of the waters discharged onto the servient estate and renders the servitude more burdensome. See Civil Code Articles 655 and 656.
Whether the owner of the dominant estate in a given case exceeds his rights and aggravates the conditions of the servient estate is an issue of fact which depends *383 upon the facts and circumstances of the particular case. Here there is no doubt that the man-made discharge of the large volume of effluent into Barnes Creek has greatly increased the burden on the down-stream properties, including the property of Mr. and Mrs. Mathis. While the property of plaintiffs is obligated to receive the surface waters that flow into Barnes Creek naturally from higher ground above, it is not obligated to receive the increased man-made flow.
Alleging that the actions of the City have caused them serious irreparable injury and damage, plaintiffs filed this suit to enjoin the discharge of effluent into Barnes Creek and to recover damages/compensation in tort for the unauthorized use of their property for drainage purposes. Although the City admits that it made a mistake in not first obtaining drainage servitudes from the property owners, it denies that plaintiffs are entitled to the requested injunction. Instead, it contends that it has acquired a servitude of drain through plaintiffs' property by "appropriation" and it recognizes that Mr. and Mrs. Mathis are entitled to just compensation for that taking.
On September 12, 1989, the Court denied plaintiffs' request for preliminary injunction to prohibit the City from releasing the effluent into the creek. At the conclusion of the trial on the merits on February 7, 1990, the Court, for oral reasons, again rejected plaintiffs' demand for an injunction. Presently the City has no reasonable or acceptable alternative to discharging the effluent into Barnes Creek. To enjoin such action at this time would result in closure of the City's primary sewage treatment facility, wreak havoc with the entire sewerage system, and create major sanitation problems for the inhabitants of the municipality. Under the circumstances present in this case such drastic action cannot be justified. In reaching this conclusion the Court believes there is no immediate threat or danger to the health and welfare of Mr. and Mrs. Mathis and they can be compensated in money for the use of their property, their losses and inconvenience. See City of Harrisonville v. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602 [77 L.Ed. 1208] (1933); Adams v. Town of Ruston, 194 La. 403, 193 So. 688 (1940) and Moreland v. Acadian Mobile Homes Park, Inc., 313 So.2d 877 (La.App. 2 Cir.1975). The facts in City of Harrisonville are remarkably similar to those in this case and there the U.S. Supreme Court denied an injunction, saying:
"* * * Where substantial redress can be afforded by the payment of money and issuance of an injunction would subject the defendant to grossly disproportionate hardship, equitable relief may be denied although the nuisance is indisputable. * * * Where an important public interest would be prejudiced, the reasons for denying the injunction may be compelling."
The Louisiana Constitution of 1974, in Article 1, Section 4, provides that property shall not be taken or damaged by the State or a political subdivision except for public purposes and with just compensation paid to the owner to the full extent of his loss. A municipality has the right to expropriate any private property within or without its corporate limits for any authorized public purpose. See R.S. 33:4621. The plaintiffs in this case admit that the City had the legal right and power to expropriate a servitude of drain on their property, but argue that since it failed to do so it is a trespasser and liable to them in tort for the damages they have sustained. The City admits that it did not expropriate a servitude, but it denies it is a trespasser. Instead, it contends it has acquired a valid servitude of drain on plaintiffs' land by appropriation.
According to the jurisprudence, where a public body with expropriation power takes or damages private property for public purposes without expropriation proceedings, it is said to have acquired the property by appropriation and it owes just compensation to the owner from whom it is taken. Under such circumstances the property owner whose property has been taken without expropriation may sue the public body to recover just compensation for his loss. Such a suit is sometimes referred to and described as one of "inverse condemnation" *384 and is not considered a tort action. Among some of the more important Louisiana cases recognizing and applying the doctrine of appropriation are: Reymond v. State, Department of Highways, 255 La. 425, 231 So.2d 375 (1970); Hawthorne v. Louisiana Department of Public Works, 540 So.2d 1261 (La.App. 3 Cir.1989); Boothe v. Department of Public Works, 370 So.2d 1282 (La.App. 3 Cir.1979); State, Department of Highways v. Mouledous, 199 So.2d 185 (La. App. 3 Cir.1967); and Bernard v. State, 127 So.2d 774 (La.App. 3 Cir.1961). Additionally, the doctrines of appropriation and inverse condemnation are implicitly recognized by the provisions of R.S. 13:5111, which provide for an award of attorney fees to a plaintiff who is granted compensation for the taking of his property by a public body other than through an expropriation proceeding.
The operation of the sewage facility on Ball Road is a proper and appropriate activity of the City and serves an essential public need. In connection with the operation of that facility the City had legal authority to expropriate a servitude of drain across the properties traversed by Barnes Creek. Since the City had the right to expropriate such a servitude, it could acquire one through appropriation and that is what occurred in this case. The City began in December 1986 to use the creek to drain the effluent away from the plant on Ball Road and it has continued to do so until the present time. The effect of that action amounted to the taking of a servitude of drain for public purposes. The evidence establishes that while this taking by the City was unauthorized, it was done in good faith and to meet a public need.
Having found that the City has appropriated a servitude of drain across the Mathis property through Barnes Creek without expropriation, the Court must determine and fix the amount of compensation to which plaintiffs are entitled.
According to a survey and plat (P-14) made by Stanley Vidrine, a registered surveyor, the 240 acre tract owned by Mr. and Mrs. Mathis and partially traversed by Barnes Creek is rectangular-shaped, running north and south three-fourths of a mile and east and west for one-half of a mile. A public road known as Thunder Valley Road borders the property on the east and another public road, known as Mennonite Road, goes across the property in an east-west direction. Approximately one-third of the property is located north of Mennonite Road and the remaining two-thirds is located on the south side of that road.
Barnes Creek enters the Mathis property from the north, at a point 773.7 feet east of the northwest corner of the property, and meanders in zig-zag fashion in a general southerly direction through the acreage north of Mennonite Road. To the east of Barnes Creek and somewhat parallel to it is a tributary stream or depression which also meanders in a southerly direction through the 80 acres. Both Barnes Creek and the tributary continue southward past Mennonite Road and then converge about 500 feet south of that road. See P-5 and P-7(a & b). From that point Barnes Creek continues in a southerly direction for approximately 500 feet and then meanders southwesterly to and across the west line of the Mathis property. According to the Vidrine survey and plat, Mr. and Mrs. Mathis have 165.54 acres east of Barnes Creek and 76.32 acres west of the creek.
The areas traversed by Barnes Creek and the tributary stream are low hardwood bottomland with thick underbrush. Apparently there was a heavy stand of timber on most of the property when it was purchased by plaintiffs, but, according to Mr. Mathis, much of that timber has been cut. Most of the land west of Barnes Creek and south of Mennonite Road was clear-cut and in recent years that area has been leased to a farmer who used it to raise sod. The land east of the creek and south of Mennonite Road is largely cleared of timber and used to pasture cattle. The land north of Mennonite Road and west of Barnes Creek has some small timber and much underbrush on it. That area is not fenced along the road and apparently is not being used for any particular purpose. The area north of Mennonite Road and east of *385 Barnes Creek is not fenced along that road or along Thunder Valley Road on the east side.
Plaintiffs have a mobile home park located on the north side of Mennonite Road near the point where that road intersects with Thunder Valley Road. At the time of the trial there were four or five mobile homes located in that park. Also at that point is a real estate office maintained by Mrs. Mathis. Except for the mobile home park and the office location, the land located north of Mennonite Road and east of Barnes Creek is not being used for any specific purpose.
The Mathis family home is located off Thunder Valley Road approximately three-fourth mile south of Mennonite Road. However, that home is not situated on the 240 acres involved in this suit and it is not located close to Barnes Creek.
Although a servitude of drain through Barnes Creek has been appropriated by the City, the area encompassed by the servitude has never been established and, for the benefit of both the City and Mr. and Mrs. Mathis, it is necessary and desirable that this be done. See Bernard v. State, supra, where the Court in an appropriation case ordered and decreed a servitude of drain and fixed the compensation due the landowner.
From the evidence presented the parties appear to recognize and accept that a right-of-way extending fifty feet on either side of the center line of Barnes Creek, or a total servitude width of 100 feet, is necessary to provide reasonable access to the City to inspect, maintain and improve the drain without further interference with plaintiffs' remaining property. The proposed area was surveyed and platted by Mr. Vidrine and is shown in detail on his plat (P-14). According to Mr. Vidrine's survey and computations, the 100 foot right-of-way from the point where Barnes Creek enters the Mathis property to the point where it leaves the property will cover 17.18 acres. Accordingly, the Court will grant the City a servitude of drain 100 feet wide over and through the property of Mr. and Mrs. Mathis along Barnes Creek with the center line of the creek to be the center line of the servitude, all as shown in detail on the Vidrine survey and plat (P-14).
Plaintiffs and defendant each presented the testimony of an expert appraiser to estimate the value of the 17.18 acres in the servitude. Plaintiffs' witness, Normand Terry, said that the Mathis property was being used primarily as a cattle farm and that is the highest and best use of the land. He appraised the woodlands along the creek at $600.00 per acre. The witness for the City, Charlie McCain, valued that land at $400.00 per acre. Mr. Terry said that under the circumstances in this case the land subject to the servitude has no residual value to Mr. and Mrs. Mathis and, therefore, they should be awarded the full $600.00 for each of the 17.18 acres or a total of $10,308.00. On the other hand, Mr. McCain said the limited taking will not deprive plaintiffs of more than fifty percent of the value of their property. Thus, he estimated the value of the servitude at $200.00 per acre (fifty percent of the full $400.00 per acre value) for the 17.18 acres or a total sum of $3,436.00.
In arriving at their estimates of value on the land covered by the servitude, both Mr. Terry and Mr. McCain relied upon numerous comparable sales. Consideration of comparable sales is a reliable method for determining the market value of land. Of course, appraisers do not always agree on what is a comparable sale. One appraiser may rely heavily upon one alleged comparable, while another appraiser rejects the same sale as being dissimilar. In this case some of the comparables relied upon by Mr. Terry and Mr. McCain appear to the Court to be of doubtful relevance and minimal assistance in evaluating the land in question. Those that appear to be most relevant do tend to support Mr. McCain's evaluation more than that of Mr. Terry. The comparable that Mr. Terry said was the most important to his appraisal of $600.00 an acre is not persuasive to the Court. The location of that property and the circumstances of that sale prevent it from being a true or useful comparable to the Mathis land involved in the servitude.
*386 After careful consideration of the testimony of Mr. Terry and Mr. McCain and close scrutiny of the various comparables used by them in arriving at their opinions, the Court finds that in December, 1986 the value of the 17.18 acres of bottom woodland was $425.00 per acre or a total of $7,301.50. That evaluation is slightly higher than the appraisal of Mr. McCain and a good bit lower than that of Mr. Terry, but the Court believes it is supported by the evidence and represents the fair market value of the land in question.
Since only a servitude of drain is involved, Mr. and Mrs. Mathis will retain title to the 17.18 acres and will continue to have certain rights in and to it. Where only a servitude is taken which allows a landowner some residual use of the surface of the land, an award of a percentage of the full fee value is appropriate and proper. See Greater Baton Rouge Airport District v. Hays, 330 [339] So.2d 431 (La.App. 1 Cir.1976), writ denied 341 So.2d 403 (1977). The residual value to a landowner depends upon the location and use of the property involved. That value can and does vary considerably.
Even with the effluent flowing in it Barnes Creek is rather narrow and shallow and stays within its banks except after heavy rains. It will overflow from a heavy rain, but it did that before any effluent was involved. Thus, only the bed and banks of the creek will be used for drainage at all times. The area in the servitude outside the actual bounds or limits of the creek will continue to be available to plaintiffs for limited use, such as hunting. Also the mineral rights in the entire servitude area will continue to be owned by Mr. and Mrs. Mathis. In the future, if the servitude is released or abandoned by the City or extinguished for nonuse, the owner of the land will then be vested with full ownership rights. Thus, the Court cannot accept Mr. Terry's opinion that the rights retained by Mr. and Mrs. Mathis will have absolutely no residual value. On the other hand, the retained rights will have less value than that estimated by Mr. McCain. Under the circumstances in this case, considering the use of the property and the rights retained by the plaintiffs, a reasonable residual value is twenty percent and that amount will be allowed by the Court. Based upon a fee value of $425.00 per acre, the twenty percent residual value retained by plaintiffs amounts to $85.00 per acre and results in a net award to them of $340.00 per acre for the servitude of drain. Accordingly, for the 17.18 acres in the servitude taken by the City, Mr. and Mrs. Mathis are entitled to compensation in the amount of $5,841.20 ($425.00 - 85.00 = $340.00 × 17.18 = $5,841.20).
Plaintiffs contend that the taking of the servitude of drain has resulted in severance damages to their remaining property. Severance damage may result from a partial taking and is any depreciation in the market value of the remainder of the landowner's property caused by such taking. Such damages are recoverable and are ordinarily calculated as the difference between the value of the remaining property immediately before and after the taking. However, there are some unusual situations where severance damages are determined by a "cost to cure" approach. In other words, the owner is allowed to recover the cost of correcting or curing the damage done to the remaining property. Where severance damages are claimed the landowner has the burden of proving those damages by a preponderance of the evidence.
In this case plaintiffs contend that the cost to cure approach is appropriate and should be utilized to determine the severance damages. They maintain that because of the quantity and quality of the effluent flowing through Barnes Creek, it is necessary to fence both sides of the entire servitude area to keep cattle away from the stream and to build at least two bridges that will allow access to their land on each side of the creek. Plaintiffs argue that the effluent is polluted and contaminated to the extent that it poses a health hazard to their livestock and possibly to humans. Their appraisal expert, Mr. Terry, said that without proper fencing and *387 adequate bridges there would be a diminution of the value of the remaining acreage that would exceed the cost of erecting a fence and building bridges.
Defendant denies that plaintiffs have sustained any recoverable severance damages as a result of the taking of the servitude of drain. The City also denies that the effluent has been or is harmful to livestock and further denies that plaintiffs have any need for or entitlement to a fence or bridges.
The governmental permits under which the City operates the Ball Road sewage facility require periodic monitoring and testing of the effluent to determine if it is in compliance with the authorized limits and the required standards of those permits. The Court heard much testimony concerning the results of the various tests that have been performed since December 1986. Both plaintiffs and defendant presented expert witnesses who had access to and reviewed the same testing data, but who, predictably, arrived at different or conflicting opinions and conclusions. That data revealed that since the plant went into operation in December 1986 there have been occasional violations of the permit limits and standards. Plaintiffs' expert, Dr. Richard Garcia, testified at great length about those violations and emphasized their potential for harm to plaintiffs' land and cattle. The extreme partisanship of Dr. Garcia was readily apparent and detracted from the value of his testimony. When pressed on the point, Dr. Garcia reluctantly conceded that he did not have enough data to conclude that the Mathis property had been actually contaminated by the effluent or that the effluent had caused any damage to the Mathis cattle or that it would likely cause harm to those animals or to humans. He pointed out that some of the mercury readings were high and he stressed the harmful qualities of that substance. He added that the bottom or bed of the creek might be contaminated and should be sampled and tested to determine if any mercury is present. Dr. Garcia did not explain why, in view of the importance he attached to it, he had not made or arranged for such sampling and testing. He raised a doubt about possible mercury contamination, but yet took no steps to resolve the issue. This was not helpful to the Court!
The testimony of Dr. Garcia was opposed by the City's experts, Dr. Ed Murry and Richard Brandt, who, while acknowledging that there were some test results that showed excessive readings for pollutants, said the overall data indicated the effluent from the plant had been within required and acceptable levels. Based upon their review of the test results, it was their opinion that the effluent was not and had not been dangerous to human or animal life.
The City also presented evidence that in January 1990 the effluent was tested by the Sabine River Authority to determine any toxicity problems. A bioassay made by Miles A. Hall, a biologist for the Sabine River Authority, showed that the water quality parameters measured were in the normal range for effluent and showed no evidence of toxicity.
According to the evidence, Mr. Mathis has had cattle on the land south of Mennonite Road and east of Barnes Creek since February or March 1987, which was only two or three months after the City began releasing effluent into the creek. There were 160 to 170 cattle in that area at the time of the trial. Mr. Mathis said the cattle have had access to the creek and at times have drank from it, but none have been sick or died as a result of drinking from it or from otherwise being exposed to it. In short, plaintiffs presented no evidence that the effluent has had any harmful or adverse effect on their cattle or on any other cattle having access to the creek. If their claim for severance damages depended entirely upon proof that the effluent has been toxic and has actually contaminated some of their land or harmed some of their animals, they could not recover because such things have not been proven by a preponderance of the evidence. However, the claim for such damages does not necessarily depend upon such a showing. *388 Plaintiffs are not seeking damages for loss of or injury to cattle or for physical injury to land outside the servitude area. They contend the taking of the servitude of drain has reduced the value of their remaining property and they seek to recover the cost of correcting or curing that damage.
As for the claim for the cost of fencing, the question is whether the presence of the effluent, whether toxic or not, will cause the value of plaintiffs' land outside the servitude area to be diminished unless a fence is erected along both sides of the right-of-way to prevent cattle from getting into or drinking from the creek. The Court finds from the evidence presented that it is more probable than not that such a reduction in value will occur, but only as to the 160 acres located south of Mennonite Road, which is the only area that has been involved with or that is suitable for a cattle operation.
The highest and best use of most of the land south of Mennonite Road (excluding the bottomland and and the servitude area) is for a cattle farm and, except for the area west of the creek which has been leased and used for sod farming, that is what plaintiffs have used it for in recent years. With environmental concerns being what they are at this time, it is not hard to see that the value of the property as a cattle farm will be adversely affected by the servitude of drain and the effluent flowing through it, regardless of whether the effluent is actually harmful to animals. It would be difficult to convince a prospective purchaser that the effluent would pose no threat or danger to livestock. Certainly a prospective buyer would be concerned about and consider the source and volume of the effluent, its appearance and odor, its questionable and possibly harmful contents, the fact that it flows through the property twenty-four hours a day, and the further fact that a landowner has no control over either the amount or the content of the effluent. A fence along the right-of-way to keep the cattle away from the creek would be the most reasonable way to allay such understandable concerns. Without a fence it is probable that the value of the land outside the servitude area would be reduced by an amount at least equal to the cost of fencing the right-of-way. Therefore, the cost of a fence on the south 160 acres will be allowed as severance damages.
The 80 acres north of Mennonite Road is an entirely different and separate tract of land. It is not fenced and it has never been used by Mr. and Mrs. Mathis for pasture purposes or for any other purpose involving cattle or other livestock. Except for the east side of the tract where the mobile home park and the office building are located, most of the 80 acres appears to have thick underbrush and small timber and does not seem suitable for pasturing cattle. The circumstances and concerns that dictate the need for fencing the right-of-way on the south 160 acres simply do not exist as to the 80 acres north of Mennonite Road. The Court finds that plaintiffs have failed to prove by a preponderance of the credible evidence that the land outside the servitude area on the north 80 acres will be diminished in value without a fence.
According to the testimony of Leland Smith, an experienced fence builder and contractor, it will cost $2.06 per foot to build an appropriate 5-strand barbed wire fence along the right-of-way. Although Mr. McCain said he had a smaller cost figure from a fencing contractor, the Court accepts the estimate of Mr. Smith as being the most accurate and reliable. The combined length of the two sides of the right-of-way was computed by Mr. Vidrine to be 13,629 feet, but there is no breakdown as to how much of that footage is on the north 80 acres and how much on the south 160 acres. Since two-thirds of the acreage is south of Mennonite Road, the Court will allocate two-thirds of the total footage of 13,629 feet, or 9,086 feet, to that tract. The cost of fencing 9,086 feet at $2.06 per foot is $18,717.16 and plaintiffs will be awarded that amount as severance damages on the south 160 acres.
*389 Plaintiffs also contend that bridges across Barnes Creek are necessary to cure the damage to their remaining land caused by the effluent in the stream. They seek severance damages to cover the cost of building two bridges, one north and one south of Mennonite Road. The City maintains that plaintiffs have access to all areas of their property from either Thunder Valley Road or Mennonite Road and it denies that plaintiffs are entitled to an award for the cost of building bridges.
Barnes Creek was an intermittent stream prior to December 1986 and during the dry season of the year there were locations on the Mathis property where farm equipment could be driven or moved across it and where cattle could cross without difficulty. On the other hand, during the wet season crossing was not possible because either there was too much water in the creek or the ground around it was too wet. Thus, before the City began to release effluent in the creek, crossing depended upon the weather and ground conditions and, according to the evidence, it could be accomplished only about half the time during the course of a year.
Prior to December 1986 Mr. Mathis had cut a substantial amount of timber from the south 160 acres and had cleared most of the land for pasture purposes. It was in connection with that cutting and clearing that he used heavy equipment and during the the dry season he was able to cross the creek with the equipment. However, the cutting and clearing was largely completed before the effluent began to drain through the creek and thereafter heavy logging equipment was no longer used regularly on the property. Mr. Mathis did use a tractor for mowing and he said he would cross the creek with that equipment perhaps five or six during a year.
It has already been noted that Mennonite Road separates the north 80 acres and the south 160 acres. All of the south side of the 80 acres and all of the north side of the 160 acres front on that road. Additionally, the entire east side of both tracts fronts on Thunder Valley Road. Thus, by traveling on Thunder Valley Road and/or Mennonite Road, plaintiffs can gain access to any part of their property, whether it is located north or south of Mennonite Road or east or west of Barnes Creek.
The bridge on Mennonite Road that crosses Barnes Creek presently has a five ton load limit but a new bridge is in the planning stages. The present bridge is adequate for and is used regularly by ordinary vehicular traffic, including farm tractors and mowers. None of the land, north or south of Mennonite Road, is used by plaintiffs for purposes which regularly and frequently require the use of heavy farm machinery. If there is some piece of heavy machinery needed by plaintiffs on the west side of Barnes Creek that cannot cross the bridge because of the present load limit, there is still a route, although more circuitous, along public roads that will allow such machinery to be brought to the property from Mennonite Road on the west.
On the north 80 acres there are no pastures to be mowed and there is no activity that would regularly require moving any kind of machinery across the creek. As for the south 160 acres, in recent years it has been segmented and utilized as two separate tracts and used for different purposes. Mr. Mathis has used the larger area east of the creek primarily for cattle farming, but he leased out the smaller area on the west side of the creek for sod farming.
As for the need for cattle to move back and forth across the creek, there are no cattle on the north 80 acres and there have been no cattle there; the area is not fenced. On the south 160 acres the area west of the creek has not been involved in Mr. Mathis' cattle operation in recent years and is not critical to it. If plaintiffs want to use that area for pasture purposes, the cattle can be herded there from the east side a short distance on Mennonite Road.
Considering how the Mathis property is situated with respect to public roads and how the different areas are used, the importance to plaintiffs of any natural crossing areas on the creek appears to have been overstated. Before the effluent was released any crossing of the creek on the *390 property depended upon the time of the year and the weather and ground conditions. Sometimes equipment and cattle could cross; sometimes not. Before the effluent, as now, any need for crossing back and forth was limited and sporadic. Plaintiffs have not been deprived of reasonable access, ingress or egress, to the various portions of their property. While there may be some occasional inconvenience in not being able to move equipment or cattle across the creek in dry weather, any such inconvenience is minimal and does not rise to the level of compensable severance damage, especially since there is no proof of any economic loss, past, present or future, caused by such inconvenience. Further, with a protective fence along the right-of-way on both sides of the creek on the south 160 acres, neither the larger area east of the creek or the smaller area west of the creek will sustain a reduction in value because of the absence of a bridge. Therefore, the claim of plaintiffs for the cost of bridges will be denied.
Plaintiffs also seek general damages for trespass, mental anguish, worry and humiliation caused by the actions of the City. Defendant denies that any such damages are recoverable in a case of this kind where the City is not a common trespasser, but has acquired a servitude of drain by appropriation. In other words, the City contends that this is not an action in tort, but a suit in inverse condemnation and the plaintiffs are only entitled to recover the same compensation they could have recovered in an action for expropriation.
There is some confusion in the jurisprudence as to whether general damages can be allowed in an action in inverse condemnation. A Supreme Court case directly on point is Gray v. State, Department of Highways, 250 La. 1045, 202 So.2d 24 (1967). In that case the issue was whether a tort action would lie for the recovery of damages resulting from an intentional appropriation by the State of private property for public use or whether the landowner's right to compensation was confined to recovery of the market value of the property appropriated together with any severance damages sustained as a result of the taking. The trial court had rejected a claim for tort damages, but the Court of Appeal, Third Circuit, reversed that decision and allowed substantial tort damages because the taking was by illegal appropriation rather than by lawful expropriation. See 191 So.2d 802. That decision was consistent with the court's earlier ruling in Belgarde v. City of Natchitoches, 156 So.2d 132 (La.App.1963), which had authorized tort damages in a similar case. Those decisions of the Third Circuit were cited and relied upon by plaintiffs in their original brief. However, in Gray, the Supreme Court granted a writ of review and, in no uncertain terms, overturned the decision of the Third Circuit, holding that the measure of compensation to which a landowner is entitled is determined by the same standards whether the property is formally expropriated in accordance with law or appropriated so long as it is taken for public use. The Supreme Court said the holding of the Third Circuit was not founded on a sound premise and added:
"For the constitutional guarantee of adequate compensation to the owner vouchsafes payment of the price to which a willing seller and purchaser would agree in the case of a voluntary sale and this is exactly the measure of compensation market value of the property and severance damagesto be applied in condemnation proceedings. And it makes no difference in determining the amount to be awarded that the property was appropriated and not formally expropriated. Albeit in appropriation cases the condemning authority does not obey the mandate of the law that the compensation be paid before the taking, the non-compliance of this condition precedent to the condemnation does not subject the appropriator to a penalty, for when the owner recovers just compensation, he recovers all the law gives him. To hold otherwise would be to inflict punitive damages upon the condemnor which is not permissible under our civil law system." *391 In a later case, Reymond v. State, Department of Highways, 255 La. 425, 231 So.2d 375 (1970), the Supreme Court said:
"* * * Damages which cause discomfort, disturbance, inconvenience, and even sometimes financial loss as an ordinary and general consequence of public improvements are not compensable, and are considered damnum absque injuria."
Plaintiffs argue that Gray and Reymond are out of date and no longer represent the law on the subject of general damages in an action in inverse condemnation. However, those cases have never been overruled by the Supreme Court and in Matherne v. Terrebonne Parish Police Jury, 462 So.2d 274 (La.App. 1 Cir.1984) writs denied [463 So.2d 1321], February 15, 1985 the appellate court, through Judge (now Justice) Cole, cited, quoted from and discussed Reymond and Gray and said they illustrate the proper measure of damages where a public body has taken property without expropriation.
In their reply brief plaintiffs rely heavily upon Ursin v. New Orleans Aviation Board, 506 So.2d 947 (La.App. 5 Cir.1987). In that case the court reviewed some of the jurisprudence, but not Gray, and concluded that any language in Reymond that could be construed as limiting a plaintiff's remedy to inverse condemnation has been implicitly overruled by subsequent jurisprudential developments. The court there went on to hold that the plaintiffs could recover tort damages in addition to any compensation due them under inverse condemnation.
In Acadian Heritage Realty v. City of Lafayette, 434 So.2d 182 (La.App. 3 Cir. 1983), writ denied 440 So.2d 733, landowners were allowed to recover damages for nuisance and diminution of property value based on the defendant's operation of a landfill. Noting that the case was not an expropriation action, the court approved an award for general damages. However, in Louisiana Resources Company v. Noel, 499 So.2d 1016 (La.App. 3 Cir.1986), the court said that in an expropriation case a landowner is not entitled to an award for subjective losses, such as inconvenience, worry and anxiety.
In the present case the City had the legal right and authority to expropriate a servitude of drain on the Mathis property and if it had done so, plaintiffs would not have been entitled to general damages for mental anguish and other subjective losses. The present suit is an action in inverse condemnation and, under the particular facts of this case, this Court believes that the rule set forth in Gray and Reymond is applicable and that plaintiffs are only entitled to recover the compensation that they could have recovered in an expropriation proceeding. The Ursin and Acadian Heritage Realty cases have been carefully considered, but under the facts and circumstances present here, they do not control this case.
Even if an award for general damages for mental anguish, worry and humiliation is proper in a case of this kind, plaintiffs have failed to prove by a preponderance of the evidence that they sustained any such damages. No doubt plaintiffs were concerned when the effluent first began to drain through their property and they disliked it being there, but there is no evidence to indicate that they were unusually upset or suffered actual mental anguish. This is not a sewer backup case. Plaintiffs do not live next to Barnes Creek and the effluent has not interfered with or disrupted their homelife in any manner or caused them great personal inconvenience. Odor apparently has not been a problem because Mrs. Mathis said she had noticed an odor only two or three times and that as far as she is concerned the odor is not that bad. Mr. Mathis said he noticed an odor occasionally, but he had to be close to the creek to detect it. There was no testimony from occupants of the mobile home park concerning an odor or any other disagreeable aspect of the effluent. Neither Mr. Mathis nor Mrs. Mathis had any physical, mental or emotional disorders because of the presence of the effluent and neither of them has required any medical attention because of mental anguish or abnormal worry. From the evidence, it appears that what Mr. and Mrs. Mathis experienced was normal *392 worry and inconvenience, which is not sufficient to support an award of damages for mental anguish.
In considering the effect of the effluent on Mr. and Mrs. Mathis, it is relevant to note that in July 1985 they constructed an oxidation pond on their property to serve their mobile home park and they drained the effluent from that pond into Barnes Creek. That sewage facility was still in operation at the time of the trial. Of course, most of the effluent in the creek comes from the City facility on Ball Road, but the fact is that some effluent comes from plaintiffs' own facility.
For reasons set forth above, the plaintiffs in this case are entitled to compensation in the amount of $5,841.20 for the taking of the servitude of drain on 17.18 acres of their land and in the amount of $18,717.16 for severance damages, or a total sum of $24,558.36. Under the law they are entitled to legal interest on that award from the date of taking, that is, the date when the City first began draining effluent into Barnes Creek. That date, according to the City's answer to the second amending and supplemental petition, is on or about December 16, 1986. The City argues that legal interest on an award of just compensation runs only from date of judicial demand and not from the date of taking, but that position is not supported by any of the appellate cases that actually have considered the issue. The leading on the issue is A.K. Roy, Inc. v. Board of Commissioners for Pontchartrain Levee District, 238 La. 926, 117 So.2d 60 (1960). There the Supreme Court said that where payment of compensation is not made when the landowner's property is taken for public use, interest or damage for delay in payment of compensation must be computed from the time of the taking. Other appellate cases applying that rule are Reddel v. State, Through Department of Highways, 340 So.2d 1010 (La.App. 4 Cir. 1977) and Sterkx v. Gravity Drainage District No. 1 or Rapides Parish, 214 So.2d 552 (La.App. 3 Cir.1968), writ refused November 15, 1986. Reymond and Bernard cited by the City did not discuss the issue and cannot be considered as a repudiation of the rules set forth in A.K. Roy, Inc.
Plaintiffs further seek an award for attorney fees in bringing this action and, under R.S. 13:5111, they are entitled to be compensated for reasonable attorney fees actually incurred because of their suit against the City. According to the evidence, plaintiffs have contracted with their attorney to pay him twenty-five percent of their recovery. Everything considered, the Court is of the opinion that a fee of twenty-five percent of the actual compensation (but not including interest) awarded plaintiffs is reasonable in this case and will be allowed. The compensation awarded is $24,558.36 and twenty-five percent of that amount is $6,139.59. Accordingly, a fee of $6,139.59 will be taxed as costs of court pursuant to R.S. 13:5111.
Plaintiffs presented some expert witnesses to support their demands and they ask that the fees of those witnesses be fixed by the Court pursuant to R.S. 13:3666. Under that statute the Court must determine the fees of expert witnesses and tax any such fees as costs of court. Any fee allowed must be reasonable under all the circumstances.
Parties to an action such as this may engage experts of their choice, and may agree to pay those experts specified fees for their services. The experts may also testify as to the time they spent in preparatory work and in testifying. However, an agreement entered into by a party as to the fee which an expert is to receive, or the statement of the expert as to his charges or even the actual payment of such a fee to the expert, are not binding on the court and are not criteria to be used by the court in fixing the expert fees which are to be assessed as costs in the suit. An expert witness who testifies is entitled to reasonable compensation for his appearance in court and for preparatory work done by him, but fees allowed him and taxed as costs must be reasonable. Also, the fee allowed an expert witness should be based on the relative usefulness of his testimony. In determining whether the fee of an expert *393 witness is reasonable, consideration must be given to the question of whether the preparatory work done by the witness was reasonably necessary, and in an expropriation or appropriation case whether it actually tended to show the value of the property taken or severance damages, and whether the conclusions reached based on that preparatory work were of some usefulness in determining the award which should be made. While a landowner is entitled to be compensated for the expenses which he reasonably must incur in obtaining expert testimony for trial, he is not entitled to compel the expropriating or appropriating public body to pay an unreasonable amount. In determining what is a reasonable fee for an expert, each case must be decided on its own peculiar facts. See State, Department of Highways v. Gordy, 322 So.2d 418 (La.App. 3 Cir.1975), writ refused 326 So.2d 370.
Based on the foregoing criteria, the Court will allow the following fees and expenses: $2,200.00 to Stanley Vidrine, licensed surveyor, for his survey, plats, acreage computation and trial testimony; $1,800.00 to Normand Terry, appraiser, for preparatory work and trial testimony; $300.00 to Leland Smith, fencing contractor, for preparatory work and trial testimony; and $1,000.00 to Dr. Richard Garcia for preparatory work and trial testimony. The Court considers these fees to be reasonable in light of all the circumstances of this case.
As for Dr. Garcia, his testimony was not very useful to the Court or to the plaintiffs and his charges of approximately $19,000.00 for preparatory work and trial testimony are not only excessive, but in this case totally unreasonable. According to his bill (P-19), between January 8, 1990, when he first did some work on the case, and up to and including February 4, 1990, the day before the trial began, Dr. Garcia did some work in this matter on eighteen different days and his charge for that activity is $12,956.25. From his testimony it is evident that he spent most of that time engaged in a fishing expedition trying to locate records and testing data that would prove the City was polluting Barnes Creek with toxic materials and thus should be enjoined from discharging effluent into the stream. As noted above, his efforts were unsuccessful and he conducted no independent tests of his own. His testimony was very equivocal; he raised questions but did not answer them.
The trial of the case began on February 5, 1990, and while he did not testify and was not present in the courtroom on that day, Dr. Garcia's charge for that day is $3,000.00. A similar charge was made for the following day, February 6, when he did testify. Thus, his charge for appearing two days for the trial is $6,000.00 and when $12,956.25 is added for preparatory work, the total is $18,956.25. Since no part of plaintiffs' recovery is based on or aided by the testimony of Dr. Garcia, the Court believes that a fee of $1,000.00 is very fair and reasonable under the circumstances.
The testimony of Albert Fuselier and Donald Ray Franks related solely to plaintiffs' claim for bridges across Barnes Creek and that claim has been rejected by the Court. Since that testimony did not contribute to plaintiffs' recovery or assist the Court, no expert witness fees will be allowed.
In summary, plaintiffs are entitled to judgment against defendant for $24,558.36 as just compensation, together with legal interest thereon from December 16, 1986, until paid, and for costs of Court, including an attorney fee of $6,139.59 and the expert witness fees set forth above.
An appropriate decree, consistent with this opinion and approved as to form by counsel for the parties, should be submitted to the Court not later than June 15, 1990.
DeRidder, Louisiana, this 23 day of May, 1990.
 (s)L.H. Coltharp, Jr.
 DISTRICT JUDGE
Filed: May 24, 1990
*394 Robbie Hennesey,
Dep. Clerk
NOTES
[*] Honorable William A. Culpepper participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.