STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**03-0219**

MARK TAYLOR, ET AL.

VERSUS

STATE OF LOUISIANA, DOTD

************

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT,
PARISH OF CATAHOULA, NO. 19,098,
HONORABLE KATHY JOHNSON, DISTRICT JUDGE

************
**JIMMIE C. PETERS**
**JUDGE**
************

Court composed of Chief Judge Ulysses Gene Thibodeaux, Sylvia R. Cooks, Billie
Colombaro Woodard, Jimmie C. Peters, and Arthur J. Planchard,[*] Judges.

**AFFIRMED AS AMENDED.**

**Woodard, J., dissents and assigns written reasons.**
**Planchard, J., dissents.**

**David LaFargue**
**Special Assistant Attorney General**
**Post Office Box 277**
**Marksville, LA 71327**
**(318) 253-7521**
**COUNSEL FOR APPELLANT:**
    **State of Louisiana**

**Russell Purvis**
**Smith, Talliaferro, Purvis & Boothe**
**Post Office Box 277**
**Jonesville, LA 71343**
**(318) 339-8526**
**COUNSEL FOR APPELLEE:**
    **Mark Taylor, et al.**

---

[*]Judge Arthur J. Planchard participated in this decision by appointment of the Louisiana
Supreme Court as judge pro tempore.

PETERS, J.

This litigation arises from the replacement of two highway bridges on Louisiana Highway 8 (La. 8) in Catahoula Parish by the State of Louisiana, through the Department of Transportation and Development (DOTD). Drewett Taylor and his wife, Debbie Taylor, and Mark Taylor and his wife, Patti Taylor, (the Taylors)[1] filed suit against DOTD, asserting that the replacement project and its subsequent effects caused their immovable property, which lies south of La. 8, to flood excessively, rendering it useless for any commercial purpose. The trial court awarded judgment in favor of the Taylors and against DOTD, awarding $136,000.00 in damages and $26,000.00 in attorney fees. DOTD appeals, and for the following reasons, we amend the damage award and affirm as amended.

As it traverses southwest Catahoula Parish in an east-west direction, La. 8 crosses two, small, north-south flowing streams, Yellow Branch and Bushley Creek. The land north of La. 8 is generally hilly, while the land south of the highway is basically flat. Together, the two streams drain approximately 72.9 square miles of the hill country and are located 1,000 to 1,500 feet apart from one another where they cross La. 8. Bushley Creek, which is located to the east of Yellow Branch, drains 99.4 percent of the area.

After it crosses La. 8, Bushley Creek meanders in a southwesterly direction and converges with Yellow Branch, at a point approximately 400 feet south of Yellow Branch's intersection with La. 8. Yellow Branch flows directly south from the point it crosses La. 8 to its intersection with Bushley Creek. At the point where the two streams intersect, Yellow Branch ceases to exist, and the newly created stream retains the Bushley Creek identity.

_____

[1]Drewett and Mark Taylor are brothers.

The stream beds of Yellow Branch and Bushley Creek carry the day-to-day natural drainage of the northern hills, but it takes very little rainfall to cause the stream banks to overflow. Before any highways traversed the area, the overflow simply spread from the hills in sheets across the flat plain below. The original construction of La. 8 changed this natural drainage flow primarily because the roadway grade of La. 8 between the Yellow Branch and the Bushley Creek bridges was elevated such that anytime the streams overflowed their banks, the backwater which could not drain through the Bushley Creek bridge would pool behind La. 8 and flow south to the Yellow Branch bridge. Thus, the Yellow Branch bridge acted as an escape valve for Bushley Creek's excess water. This had the effect of channeling the flow of the two streams to the land south of the highway, instead of allowing the overflow to spread naturally across all of the land lying south. At times of heavy rain, the topography of the land below the flat plain slowed the water's escape and caused it to back up onto the properties located immediately south of La. 8.

When originally constructed, the Yellow Branch bridge was eighty feet in length, and the Bushley Creek bridge spanned 300 feet. Both were constructed with timber pilings. Although adequate to disburse the runoff from an average rainfall in the hills above La. 8, the two structures were not adequate to disburse extraordinary runoff caused by a heavy rain. In such an event, the bulk of the water flowed through the Bushley Creek bridge because of the size disparity between the two structures. Once the water flowed through the two structures, it began to overflow onto the property adjacent to the natural streambed.

In December of 1982, a public school facility located immediately west of Yellow Branch and North of La. 8, the Manifest School, flooded when a rainfall in the hills created a "fifty year flood." This rainfall event was followed in February and

2

April of 1983 by two "twenty-five year floods," which flooded the roads near the school. Pressure from the Catahoula Parish School Board caused DOTD to consider alterations to La. 8, in an effort to avoid future flooding of the Manifest School and the surrounding area.

After studying the flooding problem associated with the Manifest School, DOTD replaced the eighty-foot Yellow Creek bridge with a 200 foot bridge and replaced the 300 foot Bushley Creek bridge with a 250 foot bridge. Both of the new structures were constructed with concrete pilings. Additionally, DOTD raised the elevation of La. 8 between the two structures by 3.8 feet and straightened the Yellow Branch channel from the new bridge to its intersection with Bushley Creek. While considering the effect that the replacement project would have on the drainage issue north of La. 8, DOTD made no effort to determine the effect that it would have on the property situated south of the highway. Construction on the replacement bridges began in January of 1994 and ended with the removal of the former bridge structures in April of 1995. The replacement project included the straightening of the Yellow Branch channel immediately south of the bridge. This replacement project gave rise to the litigation now before us.

In 1988, the Taylors had purchased 340 acres of land south of La. 8 for the purpose of raising cattle and producing hay to feed the cattle. The northern boundary of the Taylors' land lies almost due south of the Yellow Branch bridge and below its intersection with Bushley Creek. The combined Yellow Branch and Bushley Creek beds form the eastern boundary of the Taylors' property.

The Taylors filed suit in April of 1995, asserting that the newly constructed bridges resulted in increased flooding of their property, rendering it useless for their cattle operation or any other commercial use. In seeking monetary damages, the

3

Taylors acknowledged the fact that their property flooded even before the construction of the new bridges. In fact, Drewett Taylor testified that between 1988 and 1994, the property flooded on the average of two times per year, usually in the Spring. According to Mr. Taylor, these floods required at least six inches of rainfall and would inundate approximately seventy-five percent of the property for three to four hours. Mr. Taylor further explained that this infrequent flooding did not affect the cattle operation or the hay producing portion of the property. However, Mr. Taylor testified that after DOTD began construction of the new bridges in 1994, as little as a three inch rain event would cause the property to flood. This change caused the frequency of flooding to increase drastically. According to Mr. Taylor, the property began to flood on a monthly or bi-monthly basis.[2] Mr. Taylor asserted that while erosion had been a minor problem before 1994, thereafter, the erosion became significantly worse. The increased flooding washed silt and sand into the pastures so severely that a fence built in 1994 had be removed in 1997, and, by 2001, the silt and sand deposit had risen two feet. Mr. Taylor expressed his concern that the property would ultimately be cut in half by the erosion and that he and his co-owners would have to construct a bridge or large culvert to have access to all of the property.

James Richard Kreinborg, a Slidell, Louisiana civil engineer, and Dr. Jerry Rogers, a Houston, Texas hydrology expert, were retained by the Taylors to evaluate the effect that the La. 8 construction project had on their property. Both experts opined that the new bridge structures caused increased flooding and erosion of the Taylors' property. According to Mr. Kreinborg, prior to the construction of the new bridges, the wooden bridge pilings and other restrictions along La. 8 dissipated high

---

[2]While Mr. Taylor could not remember any specific flooding incident, he was emphatic that anytime after as little as a three inch rain, the property would flood.

velocity flows from the hill country. After the construction, the concrete structures allowed the water to flow with less impediment, and the Yellow Branch bridge, instead of serving as a relief structure, became a main conduit for the flow. According to Mr. Kreinborg, the additional flow through the Yellow Branch bridge, together with the straightening of the Yellow Branch stream south of La. 8, caused more water than had previously occurred to be directed toward the Taylors' property over a shorter period of time. In his opinion, this caused the flood waters to flow directly onto the Taylors' property without reentering Bushley Creek. In explaining his opinion, Mr. Kreinborg stated:

> [B]y opening the spans, the water doesn't collect north of the highway, and consequently it gets down to the Taylor property quicker. . . . but it doesn't go through the Taylor property, because nothing was done south of the Taylor property to alleviate the water. So it ponds, collects more on the Taylor property than it use[d] to.

Mr. Kreinborg opined that DOTD could have avoided the effect of this flow onto the Taylors' property by placing some energy dissipaters on the downstream side of the new bridges, in order to compensate for the energy dissipation that had been taken up by the old embankment and structures. He described a dissipater as a concrete slab with raised concrete blocks on it.

Dr. Jerry Rogers echoed Mr. Kreinborg's opinion that the construction changes caused water to move more quickly downstream to the Taylors' property. He further asserted that the highly erodible soil on the Taylors' property exacerbated the erosion problem. He also agreed with Mr. Kreinborg that energy dissipaters were needed to decrease the velocity.

In response to the testimony of Mr. Kreinborg and Dr. Rogers, DOTD presented the testimony of Frederick Cifreo and Francis H. Wyble, both experts in the field of civil engineering. Mr. Cifreo worked on the replacement project as a DOTD

5

employee. He testified that nothing really changed as a result of the project other than the redistribution of the backwater. Although he acknowledged that DOTD did nothing to evaluate the effect that the redistribution would have on the property south of La. 8, he suggested that the water velocity would dissipate 500 to 600 feet south of the Yellow Creek bridge or long before it reached the Taylors' property. In his opinion, dissipaters were not necessary.

Mr. Wyble first examined the Taylors' property in mid-April of 2001, although he had visited the area in the summer of 1998. On his first trip, he observed no erosion immediately below the bridges—the place where he expected to see the most effects from the redistributed flow. He opined that the increased velocity of the Yellow Branch channel would dissipate approximately 400 feet below La. 8, given its winding channel, and even if it left its banks, the trees along the banks would act as a barrier. In his opinion, the Taylors' property floods strictly on the intensity and duration of the rain and the saturation and moisture content of the soil. He did acknowledge that a significant ox-bow in the Yellow Branch channel had been straightened out, providing a straight flow to the Taylors' property.

DOTD also presented testimony from several local landowners, concerning the effect of the new bridges. However, their overall testimony was not particularly helpful to DOTD's position. This included: Lamar D. Cruse, whose property lies on the south side of La. 8, immediately adjacent to the highway and approximately 500 yards west of the Yellow Creek bridge; Ily C. Ewing, who resided on the Taylors' property from 1931 to 1953, and who now owns the property adjacent to it; Dewitt Lee Carpenter, whose father owned the Taylors' property between 1979 and 1989; Shelby Beasley, who owned the property before Mr. Carpenter; and Huey Womack, whose father-in-law owned the Taylors' property at one time, and who now owns the

6

property immediately east of the Taylors' property. All of these witnesses recalled that prior to the bridges being replaced, the property below La. 8 would only flood in times of excessive rainfall (two times per year according to Mr. Ewing, three times per year according to Mr. Cruse, two to five times per year according to Mr. Carpenter, during the spring according to Mr. Beasley, and anytime the water would flow over the top of La. 8 according to Mr. Womack). All of the witnesses agreed that the flooding caused a certain amount of erosion damage to the property.

Only Mr. Womack testified that he found no difference in the flood frequency since the bridges were replaced. However, he acknowledged that he had little contact with the Taylors' property since 1994. Mr. Cruse suggested that, in one year, the flooding occurred at least five times, but when questioned more closely, he could not remember if this occurred before or after 1994. Mr. Ewing testified that the property now floods more often and with less rain. Additionally, he testified that the more recent floods required twenty-four hours to drain, and the property has suffered more significant erosion in the years since the replacement project. Mr. Carpenter testified that his father took numerous steps to alleviate erosion damage, including building a dam on the property to control the flow. Despite the erosion problem, his father farmed the property for approximately four years and raised cattle for six years thereafter. Neither Mr. Carpenter nor Mr. Beasley could speak to the current status of the property, as both acknowledged that neither had been on the property since, at least, 1994.

After a trial on the merits, the trial court took the matter under advisement and ultimately issued written reasons for judgment, concluding that the Taylors were entitled to eminent domain compensation. From this judgment, DOTD appeals, asserting four different assignments of error.

7

**OPINION**

In its first two assignments of error, DOTD asserts that the trial court erred in finding that its activities constituted an inverse condemnation or appropriation of the Taylors' property and, in doing so, erred in awarding attorney fees. Secondly, DOTD argues that the trial court erred in finding that the improvements to La. 8 resulted in actionable damage to the plaintiffs' property. The consideration of these two assignments of error require an analysis of the same facts and legal issues. Therefore, we will address them together on appeal.

The state's eminent domain power is set forth in La.Const. art. I, § 4, which provides in pertinent part:

> (A) Every person has the right to acquire, own control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
> (B) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. . . . In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss.

When property is damaged by the state and expropriation proceedings have not been instituted to compensate the landowner, the landowner may bring an inverse condemnation suit under La.Const. art. I, § 4. *Ardoin v. State, Dep't. of Transp. & Dev.*, 96-63 (La.App. 3 Cir. 8/14/96), 679 So.2d 928, *writ denied*, 96-2280 (La. 11/15/96), 682 So.2d 775. "There is a three-prong analysis to determine whether a claimant is entitled to eminent domain compensation, namely: (1) whether property rights have been affected; (2) whether the property has been taken or damaged in a constitutional sense; and (3) whether the taking or damage is for a public purpose." *Id.* at 932 (citing *Constance v. State, Dep't. of Transp. & Dev.*, 626 So.2d 1151 (La.1993), *cert. denied*, 512 U.S. 1219, 114 S.Ct. 2706, 129 L.Ed.2d. 834 (1994)).

Clearly, the re-construction of the two bridges and the elevation of La. 8 was for a public purpose, and, therefore, the third element is not at issue. Concerning the first element, the Taylors placed 248.13 acres of the land at issue in the Federal Wetlands Reserve Program (Wetlands Program) by Warranty Easement Deed dated August 23, 2001. According to Mark Taylor, they did so after concluding that it constituted their only option since they could no longer raise cattle or hay on the property. By placing the land in the Wetlands Program, the Taylors continued to own the property but retained only limited rights to the use of their property for a period of thirty years. Basically, the Taylors were left with the right of quiet enjoyment, control of access, and recreational use of the property. In exchange, the Taylors received $135,107.00 or seventy-five percent of the property's appraised value, based on the government's appraisal. Only ninety-two acres remained unencumbered by the Wetlands Program. According to Mr. Taylor, it was rejected as being scrub land which had no useful purpose.

In its reasons for judgment, the trial court recognized that the Taylors owned the property from the time activity began on the re-construction project until they placed part of the land into the Wetlands Program. Additionally, the trial court recognized that the Taylors maintain an interest in the property despite the Wetlands Program encumbrance. Thus, we find no error in the trial court's conclusion that the Taylors' property rights have been affected by the actions of DOTD.

Concerning the final element, the trial court concluded in its reasons for judgment that the increased flooding and erosion caused by the construction of the new bridges "constitute[d] an inverse condemnation of [the Taylors'] property." The trial court recognized that the purpose of the new bridges was to relieve backwater pressure on La. 8 and concluded that DOTD knew this would "cause an increased

9

velocity of water under [the] Yellow Creek Bridge." Despite this knowledge and the known presence of erodible Guyton soil on the Taylors' property, DOTD took no action to ascertain the effect these changes would have on the land below La. 8. The trial court further concluded that, in addition to the increased flooding and erosion of the property, the Taylors had to terminate their cattle and hay operations.

The trial court's factual determinations will not be disturbed absent manifest error. *Stobart v. State, through Dep't. of Transp. and Dev.*, 617 So.2d 880 (La.1993). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the reviewing court may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.* Considering the record in its entirety, we find no manifest error in the trial court's factual determinations.

In addressing the legal issue arising from the trial court's factual determinations, we first note that La.Civ.Code art. 655 provides that "[a]n estate situated below is bound to receive the surface waters that flow naturally from an estate situated above unless an act of man has created the flow." Additionally, La.Civ.Code art. 656 provides in part that "[t]he owner of the dominant estate may not do anything to render the servitude more burdensome." Furthermore, the owner of the dominant estate "cannot stop [water running through it] or give it another direction and is bound to return it to its ordinary channel *where it leaves his estate*." La.Civ.Code art. 658. (Emphasis added.)

In brief, DOTD cites *Gaharan v. State, through Dep't. of Transp. and Dev.*, 579 So.2d 420 (La.1991), in support of its position that the changes to La. 8 did not constitute a taking. We do not find that *Gaharan* addresses this issue. The plaintiffs in *Gaharan* sought an injunction to prevent the state's interference with natural

10

drainage and to recover the damages sustained as a result of the interference. The supreme court was called upon only to determine whether the request for injunctive relief had prescribed and, if it had not, whether the trial court could effect a compensative damage remedy rather than require the state to remove the obstruction. The supreme court concluded that prescription had not run and that the trial court had the discretion to effect a remedy other than strict injunctive relief. The issue of injunctive relief to the Taylors is not before us.

DOTD also directs us to the supreme court's decision in *Petite Anse Coteau Drainage Dist. v. Youngsville Drainage Dist.*, 83 So. 445, 446, 146 La. 161, 165 (La.1919), for the long-standing rule that:

> 'The owner of the lower lands of two adjacent estates can do no act which would impede the natural flow of waters on his lands, from those of the higher estate. The owner of the superior estate may make all drainage works which are necessary to the proper cultivation and to the agricultural development of his estate. To that end, he may cut ditches and canals by which the waters running on his estate may be concentrated, and their flow increased beyond the slow process by which they would ultimately reach the same destination.'

> 'But the owner of the superior estate cannot improve his lands to the injury of his neighbor, and thus he will not be allowed to cut ditches or canals, or to do other drainage works by which the waters running on his lands will be diverted from their natural flow, and concentrated so as to flow on the lower lands of the adjacent estate at a point which would not be their natural destination, thus increasing the volume of water which would by natural flow run over or reach any portion of the lower adjacent estate, or to drain over his neighbor's lands stagnant waters from his, and to thus render the servitude due by the estate below more burdensome.'

(citations omitted.)

DOTD suggests that because it did not increase the *volume* of water ultimately reaching the Taylors' property, the Taylors must accept the water now flowing through the Yellow Branch bridge pursuant to La.Civ.Code art. 655.

11

We agree that DOTD has not increased the *total volume* flowing through the Taylors' property. The same total volume flows through the two structures as before the reconstruction process. However, DOTD has changed the natural course of the flow by redirecting the water such that it has increased the total volume flowing through the Yellow Branch bridge. Formally, it was an escape valve for Bushley Creek's excess water. Now it is a primary conduit for that excess water. The trial court concluded that this redirection of the excess water increased the erosion effect and severely limited the Taylors' use of their property. We find no manifest or legal error in that conclusion.

While DOTD returned the water to its ordinary channel, DOTD did not comply with the mandate of La.Civ.Code art. 658 in that it returned the water to its ordinary channel some 400 feet south of its property and not before the water left its property. While the total volume flowing through the Taylors' property remains the same, the water arrives at the Taylors' property much more quickly than before. This increased flow causes the water to back up on the property in instances of less rainfall. Additionally, the water that now flows through the Yellow Branch bridge no longer dissipates in volume or velocity as it did when flowing through the Bushley Creek bridge and then along that creek's meandering course to the Taylors' property. Instead, it flows directly to the Taylors' property with minimal impediments to slow its velocity or disburse its volume.

We find no error in the trial court's conclusion that the Taylors are entitled to eminent domain compensation.

Concerning the issue of attorney fees, we first note that attorney fee awards are available only when authorized by statute or contract. *Eubanks v. State, through Dep't. of Transp. and Dev.*, 620 So.2d 954 (La.App. 3 Cir.), *writs denied*, 629 So.2d

351, 629 So.2d 353 (La.1993). In that regard, La.R.S. 13:5111(A) provides in pertinent part:

> A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, *shall* determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for *reasonable attorney fees actually incurred* because of such proceedings.

(Emphasis added.)

Counsel for the Taylors provided the trial court with an exhibit itemizing the time spent in the litigation and the charges to his clients. This exhibit reflected a total of 201.1 hours and $31,310.50 in legal fees charged. The trial court awarded $26,000.00 in attorney fees. Considering the adequacy or excessiveness of that award, we recognize that before we can disturb that award, the record must clearly reveal that the trial court abused its discretion in making the award. *Ardoin*, 679 So.2d 928. Factors considered in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the extent and character of work performed; (3) the responsibility incurred; (4) the number of court appearances made; (5) intricacies of the facts involved; (6) the importance of the litigation; (7) legal knowledge and skill of attorneys; and (8) diligence and skill of the attorneys. *Id*.

Considering the statutory authority for attorney fees, the factors to be considered, and the record of these proceedings, we find no abuse of discretion in the trial court's attorney fee award. Additionally, considering the evidence, the determination of no manifest error in the trial court's factual determinations, we find no merit in DOTD's first two assignments of error.

13

In its third assignment of error, DOTD contends that the trial court erred in restricting and giving no weight to Mr. Wyble's testimony. The trial court recognized Mr. Wyble as an expert civil engineer but refused to recognize him as an expert in the area of hydrology as it had done with Mr. Rogers. In its reasons for judgment, the trial court stated that it gave no weight to Mr. Wyble's testimony "because he lacks the experience and expertise to evaluate how the redesign of these two bridges would affect increased velocity and the affect of this increase on the Taylor property."

Experience, as well as education, may form the basis of expertise for a witness. *State v. Guidry*, 94-678 (La.App. 3 Cir. 12/7/94), 647 So.2d 502. Generally, the determination of whether to qualify a witness as an expert is within the sound discretion of the trial judge, who is afforded great latitude in deciding whether a prospective expert has competence, background and experience to testify as an expert. *State v. Brossette*, 93-1036 (La.App. 3 Cir. 3/2/94), 634 So.2d 1309, *writ denied*, 94-0802 (La. 6/24/94), 640 So.2d 1344.

We find that the trial court did err in concluding that the study of hydrology is not a part of a civil engineer's training. The evidence presented by the other expert witnesses, including the Taylors' experts, clearly establishes that hydrology constitutes a part of the field of civil engineering. This does not mean to say, however, that one expert may have much more expertise in hydrology than another civil engineer. Such a conclusion is within the sound discretion of the trial court. Additionally, the trial record reflects that Mr. Wyble was allowed to testify extensively concerning his views of how hydrology factors affected the litigation now before us. Thus, we find that the trial court's failure to specifically recognize Mr. Wyble as an expert in the field of hydrology is harmless error.

14

Concerning the trial court's statement that it gave no weight to Mr. Wyble's testimony, we note that a trial court is not bound by expert testimony and remains free to accept or reject an expert's conclusions. *State v. Smith*, 96-261 (La.App. 3 Cir. 12/30/96), 687 So.2d 529, *writ denied*, 97-0314 (La. 6/30/97), 696 So.2d 1004. In situations where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. *Schlesinger v. Herzog*, 95-1127 (La.App. 4 Cir. 4/3/96), 672 So.2d 701, *writ denied*, 96-1328 (La. 10/4/96), 679 So.2d 1381. "When findings are based on determinations regarding the credibility of witnesses, the manifest error–clearly wrong standard demands great deference to the trier of fact's findings." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). If "a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." *Rosell*, 549 So.2d at 845.

DOTD's basic argument in this regard evolves around Mr. Wyble's testimony that he found no erosion immediately south of the new bridges and would expect to find no erosion further south on the Taylors' property and that the cause of the erosion was solely based on the nature of the soil. Given the complete record, we find that the trial court was free to accept or reject Mr. Wyble's testimony on this point. The trial court rejected this testimony, and we find no manifest error in this regard. Thus, we find no merit in this assignment of error.

Finally, the state asserts that the damage award is excessive. In considering this assignment of error, we first note that the owner of property taken by inverse condemnation is entitled to be compensated to the full extent of his loss. La.Const. art. I, § 4.

15

> In estimating the value of the property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work.

La.R.S. 19:9(A).

Additionally,

> Severance damage may result from a partial taking and is any depreciation in the market value of the remainder of the landowner's property caused by such taking. Such damages are recoverable and are ordinarily calculated as the difference between the value of the remaining property immediately before and after the taking.

*Mathis v. City of DeRidder*, 599 So.2d 378, 386 (La.App. 3 Cir. 1992).

The landowner in an inverse condemnation has the burden of proving severance damage by a preponderance of the evidence. *Id*.

The Taylors purchased the property in 1989 for $350.00 per acre. Earl Waltman, a real estate appraiser, testified that before the excessive flooding began, the property was worth $750.00 per acre. Thereafter, it decreased in value to $350.00 per acre. Using these values, Mr. Waltman testified that the Taylors had suffered a $136,000.00 diminution in value of their property as a result of DOTD's actions. The trial court accepted Mr. Waltman's testimony in setting the Taylors' damages at $136,000.00. In doing so, the trial court mentioned the Taylors' losses from the cattle and hay operation but awarded no amount for these losses.

DOTD asserts that because the appraisal for the Wetlands Program established the value of the property at $726.00 per acre ($544.50 ÷ 0.75), the trial court erred in relying upon Mr. Waltman's expert opinion. We find no merit in this assertion. The Wetlands Program transaction occurred in August of 2001. The value for expropriation purposes is established at the time immediately before the contemplated improvement and taking. La.R.S. 19:9(A). DOTD presented no evidence to establish

how, if at all, the property's value changed between 1994 and 2001. Therefore, we do not know what value an appraisal for the Wetlands Program would have established if prepared in 1994.

"In an expropriation proceeding, a trial judge's factual determinations as to value of property and entitlement to any other types of damages will not be disturbed on review in the absence of manifest error." *W. Jefferson Levee Dist. v. Coast Quality Const. Corp.*, 93-1718, p. 23 (La. 5/23/94), 640 So.2d 1258, 1277 (citing *State, through Dep't. of Transp. and Dev. v. Estate of Davis*, 572 So.2d 39, 45 (La.1990)), *cert. denied*, 513 U.S. 1083, 115 S.Ct. 736, 130 L.Ed.2d. 639 (1995). We find no manifest error in the acceptance of Mr. Waltman's testimony. We further find no manifest error in the trial court's failure to award damages for the cattle and hay operation losses as no evidence was presented to establish these losses.

However, we do find that the award must be reduced. The trial court awarded damages based on the assumption that all 340 acres suffered a diminution in value. This assumption is not supported by the record as Drewett Taylor testified that only 280 acres out of the 340 were affected by the flooding. Therefore, we reduce the award to $112,000.00.

## DISPOSITION

We affirm the trial court's award of damages and attorney fees. However, we amend the damage award by reducing it from $136,000.00 to $112,000.00. We assess costs of this appeal to the State of Louisiana, through the Department of Transportation and Development, and set the costs at $5,859.35 pursuant to La.R.S. 13:5112(A).

**AFFIRMED AS AMENDED.**

17

NUMBER 03-219

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

MARK TAYLOR, ET AL.

     Plaintiffs - Appellees

Versus

STATE OF LOUISIANA, THROUGH THE DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT

     Defendant - Appellant

On appeal from the Seventh Judicial District Court [No. 19,098], for the Parish of Catahoula, State of Louisiana; the Honorable Kathy Johnson, District Judge, presiding.

Woodard, J., dissenting.

Respectfully, I must dissent from the majority's opinion, as I do not find sufficient evidence in the record to prove a taking – in fact or at law. All we have are the Taylors' unsupported impressions.

The testimony established that the Taylors' property had a history of flooding before the improvements, and the photographs in evidence demonstrate that it had suffered erosion before the constructions on Highway 8. Further, the previous owners of the property testified to the history of flooding and erosion on the property.

The Plaintiffs do not dispute that it has a history of flooding; rather, Mr. Mark Taylor and Mr. Drewitt Taylor testified that, since the improvements, the flooding was more frequent and occurred with less rainfall. However, the only evidence they offered to support this contention were photographs of the property which were taken after a flood in January of 2001. (The new bridges were constructed in 1994 and the old bridges were taken out in April of 1995.) Neither offered any verification that flooding increased after the improvements in 1995. In fact, Mr. Drewitt Taylor

testified that in October of 1995, he could not tell whether the improvements had affected the property. Likewise, Mr. Mark Taylor stated:

A. That's six years ago, I can't tell you. I can't answer that.

Q. From 1995 to present, and again, approximately how many times do you think that it flooded?

A. What is it, six years about?

Q. About.

A. Really, I don't know. It could have flooded 30 times.

Q. And your brother indicated ten, maybe more?

A. He's just guessing, I guess. I'm just saying it could have. I don't know. I guess we'd have to get data to – I don't know.

However, Mr. Dewitt Carpenter, whose father owned the property from 1979 to 1989, explained that during that time, Bushley Creek would overflow and flood the property "anywhere from two to five times a year, just depending on what kind of rainy season that you had." Further, Mr. Mark Taylor conceded that Mr. Lamar Cruse's and Mr. Huey Womack's neighboring properties, likely, flooded every time the Taylors' property flooded. Both, Mr. Womack and Mr. Cruse testified that they had experienced no noticeable difference in the flooding of their properties after DOTD's improvements.

The Taylors point, specifically, to two areas in which the Bushley Creek overflows and causes greater erosion to their property. One area is dubbed the "big washout," which is the most prominent bend in Bushley creek once it reaches the Taylors' property. The other area is the next bend of the Creek. However, all of the previous owners of the property stated that these areas had always been areas of primary concern due to flooding and erosion.

For example, Mr. Ily Ewing grew up on the property and has been familiar with it since 1931. He said that, when he was raised there, about 100 acres were cleared and that in the early 1970's, Mr. Shelby Beasley cleared more of it, resulting in the amount that is cleared now. Mr. Beasley, who owned the property from the early 1970's until 1979 or 1980, testified that he had cleared 180-200 acres of it. Regarding

2

the "washout" area, which the Taylors claim DOTD's improvements has damaged, Mr. Beasley testified:

> A. We didn't put any debris in the Bushley at that point. We did have trouble with erosion. When the creek got out of it's banks, and I had cleared it, and I had plowed it, and invariably, when it would rain in the spring, we had problems to the extent that I decided to build up the road going in and make sort of a levee effect.
>
> . . . .
>
> Q. And you built it up, you built up the road, how did you do that, you'd scrape dirt up?
>
> A. I had a backhoe and a cat come in, Mr. David I. Patten built it for me.
>
> Q. And after you did that, did that prevent the water from coming over it?
>
> A. No, it didn't. That very fall, I had the worst blowout ever.
>
> . . . .
>
> Q. That's where we have big wash out?
>
> A. Right.
>
> Q. That was the first time it blew out there, or did you have problems with that?
>
> A. Heretofore, before that, this wasn't the first year I had it. This was getting on up to the very latter part of the time I had it. I kept trying to raise the road and do this and do that to keep the water from coming, and that was possibly a mistake, because had it been in grass and it would come over without the head that it got when it went over the little old levee, it might not have washed as bad, but by building it up and then it fresh, too, well, it washed out pretty bad.
>
> Q. Had you had other wash outs besides this big was out area?
>
> A. Yeah. There [sic] had several areas that went out.

Further, Mr. Dewitt Carpenter, whose father owned the property from 1979 to 1989, testified:

3

Q. Is that – was the big wash out there when you got there?

A. Yes. . . And then I put a dam along the creek bank, I stopped that off right there.

Q. In other words, you put a dam between the big wash out and Bushley?

A. Right.

Q. In other words, it was traveling through there?

A. Oh yeah.

Q. And it was coming down, once it travels through the big wash out, it would go all the way south to –[Mill Creek]?

A. Right.

Q. So, you had trouble from the big washout all the way down to the property – during the time that y'all had it?

A. Oh yeah absolutely.

. . . .

A. That area up there had just started to, the trees was sliding down the bank and going in the creek.

Q. Okay. Was that something that occurred all the way down?

A. Oh, yeah. Just different areas, it just depends on – something might start it, even if the cattle start going down and watering in one spot, and then you get a big flood rain, it might start it to washing right there.

Q. Okay. So it's fair to say that this eroded all during the period of time that you had it at a fairly regular pace?

A. Yes, I would work on it, keep patching it back, but it did it.

Further, the parties entered in evidence areal photographs taken of the area in 1989, 1990, 1995, 1998, and 2001. In trying to establish that the DOTD's improvements caused the increased erosion, the Taylors pointed out the differences and the increase in the erosion by comparing the 1989 photograph with the photograph taken in 2001. However, the testimony regarding the history of flooding and erosion on the property supports that there would be noticeable differences in the

4

property over an eleven-year period, regardless of DOTD's actions. In support of their assertions that DOTD's actions caused increased erosion, the Taylors compared the 1989 photograph with one taken in 1995. However, when the 1995 photograph was taken, the old bridges were still in place. Accordingly, any of the variables that Plaintiffs' experts had attributed to the existence of the older bridges, were still in place, and playing the same role in restricting or slowing the water in 1995 as they had in 1989. For example, if the wooden piers slowed the water in 1989, they were still slowing the waters in 1995, even though the new bridge, with fewer and smoother piers, was fully constructed by then. And as one of the Plaintiffs' own experts admitted, had he known that the old bridges were still there in 1995, it may have affected his study.

Therefore, I cannot agree that the Plaintiffs' testimony in this case was sufficient to establish that they experienced more flooding or erosion after DOTD's improvements than they did before the improvements. Moreover, even accepting such a factual finding, I do not believe the Taylors have shown, as a matter of law, "damage in a constitutional sense."

In the instant case, determining whether there has been "damage in a constitutional sense" involves an examination of whether DOTD's actions frustrate servitude laws. The trial court committed a legal error by omitting an analysis under the natural servitude drainage articles. Such analysis is mandated in order to determine whether property has been "damaged in a constitutional sense."[1] The majority supplies this analysis and supports the trial court's ultimate conclusion that DOTD's actions constituted a taking. However, as I appreciate the majority's analysis, DOTD's only impermissible action was failing to return the water to its ordinary channel before it left DOTD's property, as La.Civ.Code art. 658 requires; rather, it returns to its ordinary channel some 400 feet south of DOTD's property. Significantly, however, it resumes its ordinary channel *before* it reaches the Taylors' property.

Additionally, while I subscribe to the majority's proposition that an increased flow that causes the water to back up in instances of less rainfall can constitute a

---

[1]*See Chambers*, 595 So.2d 598. *See also Stagni v. State ex.rel. DOTD*, 01-374 (La.App. 5 Cir. 3/13/02), 812 So.2d 867, *writ denied*, 02-1469 (La. 9/20/02), 825 So.2d 1173.

taking, even absent an increase in the total volume of water traversing the property, for the reasons I already stated, I do not believe the Plaintiffs proved this fact by a preponderance of the *evidence*.

Furthermore, because I believe this to be the sole potential basis for finding a taking in the instant case, I disagree that the trial court's error concerning DOTD's expert, Mr. Wyble, can be dismissed as "harmless." The failure to recognize Mr. Wyble as a hydrology expert and, consequently, giving no weight to his testimony unfairly prejudiced DOTD.